## FARMERS RESERVOIR & IRRIGATION CO. *v.* McCOMB, WAGE & HOUR ADMINISTRATOR.

NO. 128.

Argued December 16, 1948.—Decided June 27, 1949.

*Frank N. Bancroft* and *John P. Akolt* argued the cause for the company. With them on the brief was *Walter W. Blood.*

*Jeter S. Ray* argued the cause for the Wage & Hour Administrator. With him on the brief were *Solicitor General Perlman, William S. Tyson* and *Bessie Margolin.*

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

The principal question to be decided in this case is whether the employees of a mutual ditch company are exempt from the provisions of the Fair Labor Standards Act [1] as persons employed in agriculture. The company is the Farmers Reservoir & Irrigation Company, a Colorado corporation having an authorized capital stock of $1,050,000 and an authorized bonded indebtedness of

---

[1] 52 Stat. 1060, 29 U. S. C. §§ 201–219.

$850,000, $450,000 of which is presently outstanding in the hands of the public. The company has central offices in Denver. It owns four large and several small reservoirs and a system of canals from 200 to 300 miles long, all in Colorado. The sole activity of the corporation is the collection, storage and distribution of water for irrigation purposes. The water is diverted from the public streams of Colorado, stored in the company's reservoirs and distributed to farmers through the company's canals.

The company is a mutual one. It does not sell water. It distributes it only to its own stockholders, who are each entitled to a limited quantity for each share of stock held. The income of the company is derived largely from assessments levied on the stockholders annually to pay for the costs of operating the system. There are no profits and no dividends.

The company did not comply with either the record keeping or the wages and hours provisions of the Fair Labor Standards Act, and the Administrator sought an injunction directed against continuation of these alleged violations. The company claimed that its employees were not subject to the Act. These employees fall into two categories. First, there are the field employees— ditch riders, lake tenders and maintenance men. Their activity, in general, consists of the physical operation, control and maintenance of the company's canals, reservoirs, and headgates. The second category comprises the company's office force in Denver. For purposes of this case it contains only one occupant—the company's bookkeeper.

The District Court held that the field employees were engaged in the production of goods for commerce, as those terms are defined in § 3 of the Act, but that the bookkeeper was not. It held, however, that all of the company's employees were exempt under § 13 (a) (6) as persons "employed in agriculture." This second hold-

ing was reversed, as to the field employees, by the Court of Appeals for the Tenth Circuit,[2] one judge dissenting, and, in No. 128, we granted the company's petition for certiorari on the exemption issue. The Court of Appeals did not pass on the bookkeeper's status. It regarded his case as moot because his salary was said by the company, in its brief, to have been raised to $210 per month while the appeal was pending. The court regarded this as sufficient to establish his exemption as an administrative employee under § 13 (a) (1) of the Act and therefore limited its consideration and its reversal of the District Court to the field employees. In No. 196, we granted the Administrator's cross-petition with respect to the bookkeeper.

It is conceded here that the courts below were correct in holding that the field employees are engaged in the production of goods for commerce. The company, however, argues that this requires the conclusion that they are employed in agriculture. This argument rests on the fact that the activities of the company and its employees are entirely confined within the State of Colorado. The company diverts water in Colorado, stores it in Colorado, distributes it in Colorado to farmers who, finally, consume it in Colorado. The only products moving in interstate commerce are the agricultural commodities produced by the farmers who consume the company's water. Hence, it is said that we can hold that the company's employees are engaged in the production of goods for interstate commerce only if we say that their work in supplying water to the farmers is an integral part of the production of the farm products which are shipped in interstate commerce. But that production is, of course, agriculture. Hence, the company's employees, if they are engaged in the production of goods for commerce, must be exempt as persons employed in agriculture.

---

[2] 67 F. 2d 911 (1948).

The argument rests on a misconstruction of § 3 (j) of the Fair Labor Standards Act[3]—the section which the courts below relied on in concluding that the field employees of the company are engaged in the production of goods for commerce. Section 3 (j) provides that "for the purposes of this Act an employee shall be deemed to have been engaged in the production of goods if such employee was employed . . . in *any process or occupation necessary* to the production thereof."[4] From the beginning, this Court has refused either to read this provision out of the Act by limiting the coverage of the Act to those actually engaged in production or, on the other hand, to expand it so as to include every process or occupation affecting production for commerce. We have held that, if an occupation, not itself production for commerce, has "a close and immediate tie" with the process of production, it comes within the provisions of § 3 (j).[5] Applying this standard, the Court of Appeals quite properly held that the field employees here are engaged in an occupation necessary, in the statutory sense, for the production of agricultural commodities shipped in commerce.[6]

But the conclusion that the work *is necessary* to agricultural production does not require us to say that it *is* agricultural production. This distinction between ne-

---

[3] 52 Stat. 1061, 29 U. S. C. § 203 (j).

[4] Emphasis added.

[5] *Kirschbaum Co.* v. *Walling,* 316 U. S. 517, 525 (1942); *Armour & Co.* v. *Wantock,* 323 U. S. 126 (1944); *Roland Co.* v. *Walling,* 326 U. S. 657, 663 (1946).

[6] "Necessary" understates the case. The water supplied by the company's employees is, in this case, an indispensable prerequisite for agricultural production. Cultivation began only with irrigation and it will end if the irrigation ceases. Under such circumstances, there can be no doubt of the immediacy of the connection between the production, by the farmers, for commerce and the work of the company's field employees in providing water for irrigation.

cessity and identity, or, differently phrased, between pro-
duction in the normal sense and production in the special
sense defined in § 3 (j), disposes of the company's con-
tention. The question here is whether the occupation
of the field employees of the ditch company can itself
be termed agriculture. The answer to that question is
not predetermined by the fact that the occupation is
within the scope of the Act because it has a necessary
connection, in commerce, with agricultural production.[7]

Agriculture, as an occupation, includes more than the
elemental process of planting, growing and harvesting
crops. There are a host of incidental activities which
are necessary to that process. Whether a particular type
of activity is agricultural depends, in large measure, upon

---

[7] The fallacy of the notion that an exemption carries with it all
occupations whose nexus with interstate commerce is the exempted
occupation is demonstrated by authority as well as by logic. In
*Boutell* v. *Walling*, 327 U. S. 463 (1946), for example, the question
was whether men who were employed by a service company to
service trucks carrying goods in interstate commerce were exempt,
under § 13 (b) (1), as the employees of an interstate carrier subject
to regulation by the Interstate Commerce Commission. Their only
connection with commerce was their work on the trucks of the
interstate carrier. The Court divided as to whether the employees
were themselves employed by the carrier within the meaning of
the Motor Carrier Act and, therefore, exempt. But there was no
suggestion in either of the opinions in the case that, if not employed
by the carrier, they were nevertheless exempt because their only
connection with interstate commerce was through an enterprise which
was itself exempt.

In only one case brought to our attention was a contention pre-
sented similar to that made here. In *Dize* v. *Maddrix*, 144 F. 2d
584 (1944), *aff'd*, 324 U. S. 697 (1945), the local manufacture of boxes
was held to be within the Act because the boxes were used by fisher-
men to ship their fish in interstate commerce. The fishermen were
exempt under a specific exemption in the Act covering fishing, and
it was argued that the manufacturer of the boxes should therefore
be exempt as "fishing" because its only connection with commerce
was through fishing. The argument was rejected summarily.

the way in which that activity is organized in a particular society. The determination cannot be made in the abstract. In less advanced societies the agricultural function includes many types of activity which, in others, are not agricultural. The fashioning of tools, the provision of fertilizer, the processing of the product, to mention only a few examples, are functions which, in some societies, are performed on the farm by farmers as part of their normal agricultural routine. Economic progress, however, is characterized by a progressive division of labor and separation of function. Tools are made by a tool manufacturer, who specializes in that kind of work and supplies them to the farmer. The compost heap is replaced by factory-produced fertilizers. Power is derived from electricity and gasoline rather than supplied by the farmer's mules. Wheat is ground at the mill. In this way, functions which are necessary to the total economic process of supplying an agricultural product become, in the process of economic development and specialization, separate and independent productive functions operated in conjunction with the agricultural function but no longer a part of it. Thus, the question as to whether a particular type of activity is agricultural is not determined by the necessity of the activity to agriculture nor by the physical similarity of the activity to that done by farmers in other situations. The question is whether the activity in the particular case is carried on as part of the agricultural function or is separately organized as an independent productive activity. The farmhand who cares for the farmer's mules or prepares his fertilizer is engaged in agriculture. But the maintenance man in a power plant [8] and the packer in a fertilizer factory [9] are not employed in agriculture, even

[8] *Meeker Cooperative Light & Power Assn.* v. *Phillips,* 158 F. 2d 698 (1946).

[9] *McComb* v. *Super-A Fertilizer Works,* 165 F. 2d 824 (1948).

if their activity is necessary to farmers and replaces work previously done by farmers. The production of power and the manufacture of fertilizer are independent productive functions, not agriculture.

In the absence of a detailed definition of agriculture we should be compelled to determine whether the activity concerned in the present case—the diversion, storage and distribution of water for irrigation purposes—is carried on as part of the agricultural function or is so separately organized and conducted as to be treated as an independent, nonagricultural productive function. Fortunately, however, the Fair Labor Standards Act provides a carefully considered definition which is of substantial aid in helping us to make that determination.

The definition is contained in § 3 (f) of the Fair Labor Standards Act. It says:

"Sec. 3 (f). 'Agriculture' includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities (including commodities defined as agricultural commodities in section 15 (g) of the Agricultural Marketing Act, as amended), the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market."

As can be readily seen, this definition has two distinct branches. First, there is the primary meaning. Agriculture includes farming in all its branches. Certain specific practices such as cultivation and tillage of the soil, dairying, etc., are listed as being included in this primary meaning. Second, there is the broader mean-

ing. Agriculture is defined to include things other than farming as so illustrated. It includes any practices, whether or not themselves farming practices, which are performed either by a farmer or on a farm, incidently to or in conjunction with "such" farming operations.

Dealing with these two branches of the definition in order, it is clear, first, that the occupation in which the company's employees are engaged is not farming. The company owns no farms and raises no crops. Irrigation, strictly defined—that is the actual watering of the soil—may no doubt be called farming. And the work of the farmers in seeing to it that the water released from the company's ditches is properly distributed to the growing plants undoubtedly is included in farming as being part of the process of cultivating and tilling the soil. But the significant fact in this case is that this work is not done by the company's employees. There is a clear and definite division of function. The ditch company carries the water in its own canals to the lands of the farmers. When a farmer desires water so that he can irrigate his fields he notifies the company. Its employees then operate the headgates, which are located on the company's canals and which the farmers are forbidden to operate,[10] so that the appropriate quantity of water can pass out of the company's canals and off the company's land into the farmer's irrigation ditches. The responsibility of the company's employees ceases when they so release the water. The water is supplied to the farmer at the headgates and he takes it over there and uses it, in his own laterals, as he sees fit, to irrigate his crops.

---

[10] Article VII, § 5 of the Company's By-Laws provides as follows:

"All headgates in the Company's canals shall be operated and maintained by and under the exclusive control of this company and no stockholder or any other person shall have the right to interfere with, reconstruct, repair, change, or alter, open or close said headgates or any of them in any manner whatsoever."

The ditch company, then, is not engaged in cultivating or tilling the soil or in growing any agricultural commodity. It is contended, however, that it is nevertheless engaged in farming because of the use, in the definition, of the words "production . . . of any agricultural . . . commodities" in addition to the words cultivation, tillage, harvesting, etc. Since produce is defined in § 3 (j) of the Act so as to include, "for purposes of this Act," any occupation necessary to production, it is argued that production of agricultural commodities includes any occupation necessary to the production of agricultural commodities. It is thus argued that in the case of agriculture, as distinguished from other exemptions, Congress did provide that the exemption should include not only the occupation named but also all of those other occupations whose work is necessary to it.

If Congress intended to convey that meaning by using the word production in the definition of agriculture, we should, of course, give the definition its intended scope. But we do not "make a fortress out of the dictionary." [11] And we have, therefore, consistently refused to pervert the process of interpretation by mechanically applying definitions in unintended contexts. *Lawson* v. *Suwannee S. S. Co.*, 336 U. S. 198 (1949); *Atlantic Cleaners & Dyers* v. *United States*, 286 U. S. 427 (1932). In the present case, the legislative history confirms what a natural reading of the language of the agricultural exemption would indica—the word production was not there used in the artificial and special sense in which it was defined in § 3 (j). Certainly, if it were meant in that sense, it would make surplusage of the remainder of the carefully wrought definition. And it would hardly have been innocuously placed among such specific terms as "cultivation," "tillage," "growing," and "harvesting."

---

[11] L. Hand, J., in *Cabell* v. *Markham*, 148 F. 2d 737, 739 (1945), *aff'd*, 326 U. S. 404 (1945).

But we need not speculate on the congressional meaning. The history of the use of the word production is crystal clear. It was added to the definition of agriculture in order to take care of a special situation—the production of turpentine and gum rosins by a process involving the tapping of living trees. There had been indications that such activity would not be considered agriculture, since turpentine is neither cultivated nor grown.[12] And a special amendment, § 15 (g), had been added to the Agricultural Marketing Act specifying that commodities so produced were to be considered agricultural commodities for the purposes of that Act.[13] To insure the inclusion of the process within the agricultural exemption of the Fair Labor Standards Act, the word "production" was added to § 3 (f) in conjunction with the words "including commodities defined as agricultural commodities in section 15 (g) of the Agricultural Marketing Act, as amended."[14]

[12] See S. Rep. No. 230, 71st Cong., 2d Sess. (1930).

[13] 46 Stat. 1550, 12 U. S. C. § 1141j (g). This language originated in S. 2354, 71st Congress. That bill was reported to the Senate (S. Rep. No. 230) and passed. 72 Cong. Rec. 7016 (1930). It did not come to a vote in the House. Its substance was added by the Senate to H. R. 16836, an amendment to the oleomargarine tax laws, and in this form became law. See 74 Cong. Rec. 6688, 7196 (1931).

[14] H. R. Rep. No. 2738, 75th Cong., 3d Sess., p. 2. The word "production" was not actually contained in either the House or Senate bills as originally passed. The Senate bill, S. 2475, 75th Cong., 1st Sess., as passed, contained the reference to § 15 (g) of the Agricultural Marketing Act in the following way: ". . . 'agriculture' . . . further includes the definition contained in subdivision (g) of section 15 of the Agricultural Marketing Act . . . ." See 81 Cong. Rec. 7659 (1937). This language was faulty, since the section referred to was not a definition of agriculture but of an agricultural commodity. The language was retained in this form when the bill was first debated in the House. See 82 Cong. Rec. 1580, 1690 (1937). The House voted to recommit the bill. *Id.* at 1835. In committee, the definition of agriculture was completely

It is unnecessary to decide whether, in view of this history, the word production in the agricultural exemption should be limited to those specific products defined in § 15 (g) of the Agricultural Marketing Act or should be given its normal meaning. The only question here is whether the word was used in the special expanded meaning defined in § 3 (j) of the present Act. It is clear that it was not used in this special sense. And it follows that it does not encompass the work of the company's employees who cannot be said, in any normal use of the term, to be engaged in the production of agricultural commodities. Their work is necessary to agricultural production, but it is not production.

The work of the company's employees is not, then, farming. But, coming to the second branch of the definition of agriculture, it is equally clear that it does constitute a practice performed as an incident to or in conjunction with farming. If the Act exempted all such practices, the company would be exempt. But the exemption is limited. Such practices are exempt only if they are performed by a farmer or on a farm.[15]

---

redrafted and the reference to the Agricultural Marketing Act omitted. See H. R. Rep. No. 2182, 75th Cong., 3d Sess. (1938). The bill passed the House in this form. In conference, it was agreed that the House version of the definition of agriculture should be adopted, with three stated exceptions. Only one of the three is relevant here—the reinsertion of the reference to the Agricultural Marketing Act. The word "production" was added in conjunction with that reference and was obviously used only to make the reference grammatically correct. The committee report states the change in this way: "The production of commodities defined as agricultural commodities in section 15 (g) of the Agricultural Marketing Act is included within the definition of agriculture . . . ." H. R. Rep. No. 2738, 75th Cong., 3d Sess., p. 29 (1938).

[15] Although not relevant here, there is the additional requirement that the practices be incidental to "such" farming. Thus, processing on a farm of commodities produced by other farmers is incidental to or in conjunction with the farming operation of the other farmers

This language was carefully considered by Congress. As originally introduced, the exemption covered such practices only if performed by a farmer. On the floor of the Senate it was objected that this would exclude the threshing of wheat or other functions necessary to the farmer if those functions were not performed by the farmer and his hands, but by separate companies organized for and devoted solely to that particular job.[16] To take care of that situation the words "or on a farm" were added to the definition. Thus, the wheat threshing companies, even though they were separate enterprises, were included in the exemption because their work was incidental to farming and was done on the farm.[17] In the face of this careful use of language, we are required to limit the exemption as Congress intended it should be limited, to practices performed by a farmer or on a farm. In the present case it is clear that the work of the company's employees is done neither on a farm or by farmers.

Clearly, it is not done on a farm. Nor, we think, is it done "by a farmer." Since we have already said that

---

and not incidental to or in conjunction with the farming operation of the farmer on whose premises the processing is done. Such processing is, therefore, not within the definition of agriculture. *Bowie* v. *Gonzalez*, 117 F. 2d 11 (1941).

[16] "Mr. TYDINGS. . . . In the case I visualize . . . the farmer is not performing the service. The man to whom I refer makes a business of doing nothing but threshing. He owns his own machine, and hauls it from farm to farm, and enters into contracts with farmers to thresh their crops; the point being that while he is dealing with an agricultural commodity, he is not necessarily a farmer, and he is not doing work ordinarily done by a farmer.

"Mr. BORAH. He is doing the exact work which the farmer did before he took it up.

"Mr. TYDINGS. That is true; but I do not think the bill is drawn in sufficient detail to bring the man to whom I refer under its provisions of exemption." 81 Cong. Rec. 7653 (1937). See also the comments of Senator Bone, *id.* at 7659.

[17] 81 Cong. Rec. 7888 (1937).

the company's employees are not engaged in farming, it is perhaps too obvious that the work that they do is not done by farmers. But an argument to the contrary is made. It is based on the fact that the company is a mutual one, owned by the farmers whom it serves. It is argued that the company is therefore merely a formal conduit or agent, by which the farmers cooperatively operate their common water supply system and cooperatively employ the men. The men are, therefore, said to be farmers because they are said to be employed by farmers.

Even if it were conceded that the exemption includes the work of persons who do no farming but are employed by farmers, it still does not include the company's employees because they are not, in fact, so employed. There is a difference between the hiring of mutual servants by a group of employers and the creation by them of a separate business organization, with its own officers, property, and bonded indebtedness, which in turn hires working men. Those working men are in no real sense employees of the shareholders of the organization. They are hired by the organization, fired by the organization, controlled and directed by the organization, and paid by it. The fact that the organization is a corporate one adds to the picture but is not controlling. The controlling fact is that the company has been set up by the farmers as an independent entity to operate an integrated, unitary water supply system. The function of supplying water has thus been divorced by the farmers from the farming operation and set up as a separate and self-contained activity in which the farmers are forbidden, by the company's by-laws, to interfere.[18] Those employed in that activity are employed by the company, not by the farmers who own the company. The fact that the company is not operated for profit is immaterial.

[18] See n. 10, *supra*.

It is nonetheless the employer. Of course, if Congress had intended the absence of profit to be material and had provided that the employees of agricultural cooperatives should be exempted because their work is done for the benefit of the farmers who own the cooperatives, we should honor that provision. But the legislative history of the existing definition clearly shows that no such result was intended.[19]

We conclude therefore that the Court of Appeals correctly determined that the field employees of the company are not exempt from the provisions of the Fair Labor Standards Act as persons employed in agriculture.[20]

There remains for consideration the bookkeeper's case. The Court of Appeals limited its reversal of the District Court to the field employees because it regarded the bookkeeper as exempt, in any event, as an administrative employee. We need not decide whether it erred in so doing, since the company in this Court disclaims—as it did in the District Court—any reliance on the administrative exemption. And our discussion with regard to the field employees makes it clear that the Court of

---

[19] The debate in both Houses shows a clear awareness that the employees of farmers cooperative associations would not be exempted as employees of farmers. At various times amendments were offered, and adopted, exempting the employees of certain types of cooperatives. See 81 Cong. Rec. 7947 (1937), 82 Cong. Rec. 1783 (1937). All such special exemptions were, however, omitted from the bill as it finally became law. See also Interpretative Bulletin, issued by the Administrator, Wage & Hour Division, 29 C. F. R. 1947 Supp., §§ 780.81, 780.82.

[20] While it lacks relevance to the question of congressional intention in 1938, we may note that the precise question here involved was discussed at length on the Senate floor in 1946 in connection with certain amendments to the Fair Labor Standards Act. It was clearly stated, without objection, that employees of an irrigation company which supplied water to farmers were, like the employees of a power company which supplies electricity to farmers, not exempt as employed in agriculture. 92 Cong. Rec. 2318–2319 (1946).

Appeals decision is, in the absence of any claim of ad-- ministrative exemption, equally applicable to the book- keeper. It has been stipulated that his work is a neces- sary part of the operation of the company's water supply system. The fact that it is clerical rather than manual is immaterial. *Borden Co.* v. *Borella*, 325 U. S. 679 (1945). It follows that his case is on all fours with that of the field workers and that he is engaged, as they are, in the production of goods for commerce and is not exempt as employed in agriculture. The judgment of the Court of Appeals, reversing the District Court and remanding the case to it, should, therefore, be treated as applicable to both types of employee.

As so modified, the judgment is

*Affirmed.*

MR. JUSTICE FRANKFURTER, concurring.

Both in the employments which the Fair Labor Stand- ards Act covers and in the exemptions it makes, the Con- gress has cast upon the courts the duty of making dis- tinctions that often are bound to be so nice as to appear arbitrary in relation to each other. A specific situation, like that presented in this case, presents a problem for construction which may with nearly equal reason be re- solved one way rather than another. Except when a conflict between Courts of Appeals requires settlement by this Court, it does not seem to me very profitable to bring the individual cases here for adjudication. But since this case is here it has to be decided. The nature of the problem being what it is, I acquiesce in the judg- ment that commends itself to the majority of my brethren.

MR. JUSTICE JACKSON, dissenting.

If employees operating these irrigation works are so necessary to the raising of crops destined for interstate commerce that they are "producing goods for commerce"

within the Fair Labor Standards Act, I cannot agree that they are not "employed in agriculture" within its exemptions.

It is admitted that as a separate enterprise this handling of irrigation water does not bring these employees within the Act regulating interstate commerce, because the water is captured, stored, transmitted, delivered and consumed solely within one state. The reasoning by which they are nevertheless brought under the Act is this: To deliver water on arid lands is so inseparable from agriculture thereon that it is to produce goods, that is, agricultural crops, for commerce.

However, 29 U. S. C. § 213 (a) (6) exempts individuals "employed in agriculture." It would seem logical that one who is producing agricultural products for commerce is "employed in agriculture." But according to the Court he is not. The irrigation activity seems endowed with some esoteric duplicity not apparent on its face. When we read 29 U. S. C. § 206 or § 207, the irrigator is producing crops because his activity is inseparable from crop production; but when we read on a half-dozen sections and get to 29 U. S. C. § 213 (a) (6), the irrigation has been converted into a distinct and disconnected enterprise.

This paradox is attributed to the definition of agriculture in 29 U. S. C. § 203 (f), which is said to make a distinction between agricultural production "in a normal sense" and the same thing "in the special sense" of § 3 (j) of the statute, 29 U. S. C. § 203 (j). However, its text and history seem to show that the congressional purpose was not to make the agricultural exemption less comprehensive than "normal" agricultural operations but to make certain that nothing connected with farming remained subject to the Act. It exempted "any practices . . . performed by a farmer or on a farm as an incident to or in conjunction with such farming operations." Thus the farm exemption did not end at the line fence.

This irrigation seems to me to be "performed by a farmer" and hence, by definition, part of the operation of agriculture. Certainly the agricultural exemption is not lost because farmers pool their capital through a mutual, nonprofit corporation for no other purpose whatever than to carry water to their own arid lands to make it possible to produce crops. The only purpose of the corporate form is to limit individual liability for a project which is subsidiary to each farmer's main enterprise but which is beyond the means or demands of any of them as individuals. Only the landowners can become stockholders; only the stockholders can become water users, and the operating costs and capital charges are met by assessing them in proportion to their water benefits. Employees engaged in the water operation would be on a quite different footing if it were a water company selling water to the public or the farmer for profit.

If, as the Court holds, these employees are engaged in production of agricultural crops for commerce, I do not see how it can hold that they are not engaged in agriculture. If the Court could say "To be or not to be: that is the question," it might reasonably answer in support of either side. But here the Court tells us that the real solution of this dilemma is "to be" and "not to be" at the same time. While this is a unique contribution to the literature of statutory construction, I can only regret the great loss to the literature of the drama that this possibility was overlooked by the Bard of Avon. It will probably now be as great a surprise to the proponents of the agricultural exemption as it would have been to Shakespeare, had it been suggested to him.