384 P.2d 104

**G. L. WRIGHT, Appellant,**

v.

**SALT RIVER VALLEY WATER USERS' ASSOCIATION, an Arizona Corporation, Appellee.**

No. 6840.

Supreme Court of Arizona.

En Banc.

July 22, 1963.

Rehearing Denied Sept. 17, 1963.

in the forebay of the dam was not used for the generation of electricity at the dam but simply for diversion into canals thereafter principally to be used in farming.

Shute & Elsing, James J. Cox, Jr., and Minne & Sorenson, Phoenix, for appellant.

Jennings, Strouss, Salmon & Trask, Phoenix, for appellee.

GORDON, Judge.

Appellant, G. L. Wright, as plaintiff brought an action in the Superior Court in Maricopa County to recover for unpaid wages, liquidated damages and attorney's fees under the Fair Labor Standards Act of 1938 as amended, Title 29, U.S.C.A. §§ 201 et seq. He appeals from a judgment entered in favor of defendant after a trial to the court.

For some years prior and from April 1, 1954 until April 1, 1956, the period in question, plaintiff was employed by defendant as a gate operator at the north gates of Granite Reef Dam in Maricopa County, some 35 miles from Phoenix, Arizona. One Harold E. Sommer, not a party to this action, held similar employment with defendant during the questioned period at the south gates of Granite Reef Dam. The sole purpose of Granite Reef Dam is to divert water from the forebay back of said dam through control gates at each end of the dam into canals for delivery to members of defendant Association for use in irrigation. The water

From April 1, 1954 until April 1, 1956, plaintiff operated the gates on the north side of Granite Reef Dam. Sommer operated the gates on the south side and they alternated in operating the gates at a station called Evergreen, a few miles downstream from Granite Reef Dam on one of defendant's canals. Plaintiff's work consisted generally of checking the amount of water in the forebay by reading gauges on his side of Granite Reef Dam; mechanically setting the gates which regulated the flow of water into the Arizona Canal; patching leaks under the flash gates on the dam; making several daily telephone reports to defendant in Phoenix; receiving telephone instructions from defendant with respect to the amount of water to be released into the canal, which instructions were usually given once a day; making one or more telephone reports to Sommer or receiving such reports from him; greasing machinery every two weeks or so; directing trespassers to leave an area defined by defendant; maintaining his truck; keeping the lawn and premises where he lived in a respectable condition (a home near the dam was furnished to plaintiff by defendant at a nominal rental); on occasion dragging a portion of the road leading to the premises where he lived; and during emergencies such as

floods, to stand by to operate the gates as directed. Both operators worked hours that were intermittent.

Early in 1951, prior to the period in question, officials of defendant conferred with plaintiff and Sommer with respect to setting up three eight-hour shifts and the employment of a third gateman to work at Granite Reef and Evergreen. At that time plaintiff and Sommer advised defendant that such a plan would not be feasible, and upon defendant's request they submitted a plan that they considered to be feasible for such an operation, which was approved by defendant and was followed by all parties from 1951 until at least April 1, 1954. Plaintiff denies that this plan was followed by the parties from April 1, 1954 to April 1, 1956, but this was contradicted by the testimony of Sommer and several other employees of defendant. The plan acted upon during the entire period was that there was to be no third gateman employed, but that plaintiff and Sommer would operate their respective sides of Granite Reef and alternate in the operation of Evergreen.

The contracts of employment of plaintiff, Sommer, and all other employees of defendant, from 1950 until the expiration of the time involved herein, were negotiated with defendant by the International Brotherhood of Electrical Workers' Union Local BA 266, and from October 16, 1952 until April 1, 1954, these employment contracts provided for a certain number of hours and days of work for plaintiff and Sommer. Under this contract the parties agreed that plaintiff was to be paid for ten hours per day at the rate of eight hours straight hourly wage; two hours at time and one-half; and time and one-half for overtime, which was all hours in excess of forty which he actually worked during any week.

Notwithstanding these provisions, however, plaintiff and Sommer did not work fixed shifts, but insofar as hours and shifts were concerned, they continued to work according to the plan worked out with defendant in 1951. They received and accepted without protest during this period their pay, based on the hourly rates prescribed by the union negotiated contract. The contracts of employment negotiated by the union with defendant, which were in effect from April 1, 1954 until April 1, 1956, did not provide definite hourly shifts and days for plaintiff and Sommer, although they did for all other classes of employees. Defendant contends that the reason for this is that it was the request of plaintiff and Sommer that they not be bound by shifts, but continue on as before.

Plaintiff denies that it was at his request and claims that he is entitled to be paid for twenty-four working hours each day (eight hours at straight time and sixteen hours at time and one-half), seven days a week, and twelve months each year for each of the two years in question. Plaintiff was paid regularly throughout the term in

question, but he contends that his duties required him to be at his post twenty-four hours a day, unless excused, and that although there were intermittent periods during the twenty-four hours when he was not engaged in physical activities for the defendant, that time as a matter of law was "working time" under the Fair Labor Standards Act as it applies to him.

Plaintiff complains here that the trial court erred in finding: that plaintiff was not employed in commerce or in the production of goods for commerce within the meaning of the Fair Labor Standards Act of 1938, as amended; and that plaintiff's employment comes within the provisions of Title 29, U.S.C.A. § 213(a) (6) of the Fair Labor Standards Act of 1938, as amended, and is therefore specifically exempted from the provisions of said Act.

§ 206(a) of the Fair Labor Standards Act provides that an employer shall pay each of his employees *"who is engaged in commerce or in the production of goods for commerce"* at certain rates.

§ 207 of the Act, dealing with maximum hours, uses the same language referring to each employee who "is engaged in commerce or in the production of goods for commerce." It was stipulated by the parties at the trial "that some of the crops that are grown in the Salt River Project are shipped in interstate commerce and those crops are grown by the use of water furnished by the defendant."

The main issue before this Court, then, is whether the activities of plaintiff as an employee of defendant are such that he is covered by the Fair Labor Standards Act, and if so, whether defendant may avoid the application of the act by showing that plaintiff's activities as an employee are such that he is exempted from the coverage of the Act.

In June, 1949, at the time of the United States Supreme Court's decision in Farmers Reservoir and Irrigation Co. v. McComb, 337 U.S. 755, 69 S.Ct. 1274, 93 L.Ed. 1672, the agricultural exemption to the Fair Labor Standards Act, Title 29 U.S.C.A. § 213, read in part as follows:

"(a) The provisions of sections 206 and 207 of this title shall not apply with respect to

\* \* \* \* \* \*

"(6) any employee employed in agriculture."

The definition of "agriculture" at that time was set forth in Section 203(f) and has not been changed by amendment:

"(f) 'Agriculture' includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities \* \* \*, the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any for-

estry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market."

The definition of "produced" was then set forth in Section 203(j) as follows:

"(j) 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State."

With these laws, as they existed at the time, the Supreme Court in Farmers Reservoir and Irrigation Co. v. McComb, supra, found that ditch riders, lake tenders, maintenance men and even a bookkeeper employed by a mutual ditch corporation in Colorado, formed and operated as a non-profit, no-dividend corporation by farmers which had for its sole business the collection, storage and distribution of irrigation water to the farmers who held stock in the corporation, all of whose farms were located within Colorado, were covered by the Act, because these employees were engaged in the production of goods for commerce—some of the farm products grown with the irrigation water were shipped in interstate commerce. They were engaged in a process "necessary" to the production of the farm products.

A dissent was written in that case by Justice Jackson, who said:

"If employees operating these irrigation works are so necessary to the raising of crops destined for interstate commerce that they are 'producing goods for commerce' within the Fair Labor Standards Act, I cannot agree that they are not 'employed in agriculture' within its exemptions." 337 U.S. at 770, 69 S.Ct. at 1282.

In October, 1949, only four months from the date of the decision some radical amendments were made to the Fair Labor Standards Act by Congress. The sections pertinent follow with italicized portions signifying the changes:

Section 213—"(a) The provisions of sections 206 and 207 of this title shall not apply with respect to * * * (6) any employee employed in agriculture *or in connection with the operation or maintenance of ditches, canals, reservoirs, or waterways, not owned or operated for profit, or operated on a share-crop basis, and which are used exclusively for supply and storing of*

*water for agricultural purposes;* \* \*." Section 203(j)—" 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any *closely related* process or occupation *directly essential* to the production thereof, in any State."

The sum and substance of the amendments was to exclude or exempt irrigation workers from the Act under certain circumstances and to require all other employees' activities to be "closely related" or "directly essential" to the production of goods before they would be covered by the Act.

Certainly, if plaintiff's case herein had come before us after the decision in Farmers Reservoir v. McComb, and prior to the legislative amendments, we would be bound by the Supreme Court's construction on a very similar fact situation. This case arises after the 1949 legislative amendments, however, and we feel that the irrigation worker exemption under § 213(a) (6) as amended applies to the plaintiff herein, denying him coverage.

We reached this conclusion by analyzing each of the included elements of the exemption:

(1) The fact that plaintiff was employed in connection with the operation or maintenance of ditches, canals, reservoirs or waterways is not disputed and is self-evident.

(2) The fact that these facilities were not operated for profit is also plain when viewed in the light of the history of defendant's operation and the division of authority as between it and another corporate and political entity, the Salt River Project Agricultural Improvement and Power District, which entity is not a party to this action and which deals independently and distinctly with operations concerning the generation and distribution of electrical energy. City of Mesa v. Salt River Project Agricultural Improvement and Power District, 92 Ariz. 91, 373 P.2d 722; Adams v. Salt River Valley Water Users' Association, 53 Ariz. 374, 89 P.2d 1060. Defendant, the Salt River Valley Water Users' Association is not operated for profit.

Plaintiff urges that the ditches, canals, reservoirs or waterways are not being used exclusively for supplying and storing water for agricultural purposes in that parts of the system produce electrical energy which is sold at a substantial profit by the Salt River Project Agricultural Improvement and Power District. But it is conceded by plaintiff in his brief, that § 213, relating to exemptions, concerns itself with the activity of the employee and not with the business or plant facilities of the employer or a

separate legal entity working in conjunction with the employer to further the employer's end.

Here, if we were to consider as plaintiff urges, that the Salt River Project Agricultural Improvement and Power District is an alter ego of defendant, which we do not, this viewpoint would not change the fact that plaintiff was engaged in the activity of an irrigation worker, a person specifically excluded from coverage in the same exemption with employees engaged in agriculture, independent of defendant's other activities.

It cannot be ignored that plaintiff's activity was not in the remotest sense related to the generation or distribution of electricity as this occurred before the water reached the forebay of Granite Reef Dam. Plaintiff's functions and activities were solely concerned with impounding and distributing irrigation water to farmers for the raising of crops.

Plaintiff raises two other assignments of error which need not be decided in view of our holdings.

The judgment of the lower court is affirmed.

UDALL, V. C. J., STRUCKMEYER and LOCKWOOD, JJ., and JOHN F. MOLLOY, Superior Court Judge, concur.

NOTE: The Honorable CHARLES C. BERNSTEIN, Chief Justice and

The Honorable RENZ L. JENNINGS, Justice, being disqualified The Honorable FRANK X. GORDON, Jr., Judge of the Superior Court of Mohave County and The Honorable JOHN F. MOLLOY, Judge of the Superior Court of Pima County, were called to sit in their stead.