Allen E. **HELMKE** and Juanita
Helmke, Appellants,

v.

**BOARD OF ADJUSTMENT, CITY OF
RUTHVEN, et al., Defendants,**

Farmers Cooperative Elevator
Company, Ruthven, Iowa,
Intervenor–Appellee.

No. 86–809.

Supreme Court of Iowa.

Jan. 20, 1988.

Rehearing Denied Feb. 12, 1988.

Donald J. Bormann, Emmetsburg, and Griff Wodtke of Barrett & Trott, Des Moines, for appellants.

Harold W. White, Fitzgibbon Brothers, Estherville, for intervenor-appellee.

NEUMAN, Justice.

Appellants Allen and Juanita Helmke petitioned for a writ of certiorari to challenge the legality of a zoning decision made by the City of Ruthven Board of Adjustment (board). The object of the controversy is a 66 × 300 foot grain storage facility built across the street from Helmkes' rural Ruthven home by intervenor Farmers Cooperative Elevator Company (co-op). Although initially denied a construction permit for the building, the co-op prevailed on its subsequent appeal to the board of adjustment. The board found that no permit was required under the "agricultural purpose" exemption of the Ruthven zoning ordinance and, alternatively, that grain storage is a permitted use in an A-1 agricultural district under the Ruthven ordinance.

On certiorari to the district court, plaintiffs claimed the board erred as a matter of law in its interpretation of the pertinent zoning ordinance and, further, that the board members' membership in the co-op created a conflict of interest invalidating their decision. The district court annulled the writ, concluding that plaintiffs failed to prove any conflict of interest or illegality in the board's decision. We affirm.

I. *Scope of Review.* Helmkes commenced their certiorari action in district court under Iowa Code section 414.15 (1985) which allows

[a]ny person ... aggrieved by any decision of the board of adjustment ... [to] present to a court of record a petition ... setting forth that such decision is illegal, in whole or in part, specifying the grounds of the illegality.

Section 414.18 provides that the proceedings before the district court "shall be tried de novo" and the court "may reverse or affirm, wholly or partly, or may modify the decision brought up for review." In *Grandview Baptist Church v. Zoning Bd. of Adjustment,* 301 N.W.2d 704, 706 (Iowa 1981) we noted that this *de novo* review by the district court is "somewhat unusual," and cited with approval the observation we made in *Weldon v. Zoning Bd.,* 250 N.W.2d 396 (Iowa 1977) which bears repeating here:

[I]n a certiorari proceeding in a zoning case the district court finds the facts anew on the record made in the certiorari proceeding. That record will include the return to the writ and any additional evidence which may have been offered by the parties. *However, the district court is not free to decide the case anew.* Illegality of the challenged board action is established by reason of the court's findings of fact if they do not provide substantial support for the board decision. *If the district court's findings of fact leave the reasonableness of the board's action open to a fair difference of opinion, the court may not substitute its decision for that of the board.*

*Weldon,* 250 N.W.2d at 401 (citations omitted) (emphasis added).

Under Iowa Rule of Civil Procedure 318, *this court's* scope of review on appeal from a trial court judgment in a certiorari proceeding is "governed by the rules applicable to appeals in ordinary actions." Thus we are limited to correction of errors at law and we are bound by the findings of the trial court if supported by substantial evidence in the record. Iowa R.App.P. 14(f)(1). In other words, "our review is the same as from judgment following a special verdict by a jury." *Grandview Baptist Church,* 301 N.W.2d at 707 (citing *Weldon,* 250 N.W.2d at 401); *Johnson v. Board of Adjustment,* 239 N.W.2d 873, 888 (Iowa 1976); *Deardorf v. Board of Adjustment,* 254 Iowa 380, 383–84, 118 N.W.2d 78, 80 (1962).

With this limitation on our review in mind, we turn first to appellants' challenge to the court's findings on the conflict of interest issue and then consider its claim of error in the interpretation and application of the Ruthven zoning ordinance.

II. *Conflict of Interest.* The parties stipulated that all but one of the members of the board of adjustment were "member-shareholders" of the co-op. None, however, were employees, members of the board of directors or otherwise involved in the co-op's management. The chairman of the board, employed as manager of the co-op lumberyard, abstained from voting on the permit at issue.

The record reveals that the co-op had over 600 members at the time of hearing. There are two types of co-op membership: class A for farmer-producers who store grain in co-op facilities, requiring a twenty-five dollar membership deposit; and class B for town residents doing business with the co-op's lumberyard, requiring a ten dollar membership deposit.

The co-op returns twenty percent of its profits to members, and the profits are distributed in proportion to the quantity of business done by each member with the various co-op operations. The co-op paid approximately $12,000 for the six acres upon which the grain storage building sits, and $122,000 for its construction. The co-op's annual gross revenue from all sources is approximately $12 million.

Aside from this general information, no evidence was introduced concerning the amount of business done by individual board members at the co-op. Nor was any evidence presented from which the court could determine the amount of dividends, if any, distributed to board members. Likewise, the record is devoid of reference to profits, if any, which might be generated by the storage building.

Because of the insufficiency of the evidence, the district court found that Helmkes failed to establish that the board members owned "a property or financial interest the value of which would be directly promoted or reduced by the decision made." Thus the court found no conflict of interest which would invalidate the board's vote.

On appeal, Helmkes assert that no direct evidence of personal interest or gain need be shown because the conflict inheres in the board members' dual roles as public officials and co-op members. They rely on the case of *Wilson v. Iowa City,* 165 N.W. 2d 813 (Iowa 1969) in which we discussed at length the common-law foundation for the statutory conflict of interest prohibition contained in Iowa Code section 403.16, the urban renewal law. In *Wilson,* the issue was whether certain members of the city council were prohibited from voting on urban renewal resolutions because of conflicts of interest. The council members' alleged conflicts ranged from outright property ownership to control over small amounts of stock (five percent or less) in corporations which owned or had leasehold interests in real estate within the proposed project area.

Citing the salutory purpose of common-law and statutory conflict of interest rules which "demand complete loyalty to the public and seek to avoid subjecting a public servant to the difficult, and often insoluble, task of deciding between public duty and private advantage," we held in *Wilson* that *any* ownership interest, no matter how

small, disqualified the vote of a council member. *Id.* at 822–24.

It is this strict standard with regard to stock ownership applied in *Wilson* that Helmkes raised before the board of adjustment, urged upon the trial court and now urge us to adopt on appeal. Our review of the subsequent legislative history of section 403.16, however, reveals that the legislature acted swiftly to neutralize the impact of *Wilson* by amending the statute to clarify its concern regarding conflict created by public servants' minority ownership interests. Section 403.16(5), enacted within one month after our decision was announced in *Wilson,* provides:

> [s]tock ownership in a corporation having such an interest shall not be deemed an indicia of an interest or of ownership or control by the person owning such stock *when less than five percent of the outstanding stock of the corporation is owned or controlled directly or indirectly by such person.*

Iowa Code § 403.16 as amended by 1969 Iowa Acts ch. 238, § 1, eff. April 22, 1969 (emphasis added).

Similarly, Iowa Code section 362.5, which prohibits county officials from contracting with corporations in which they hold an interest, exempts from the prohibition contracts with corporations in which an official owns or controls, directly or indirectly, less than five percent of the outstanding stock. Applying this same standard to the general conflict of interest statute relied upon by Helmkes, section 362.6, we find a legislative intent to remove from the statute's purview those interests so remote as to be deemed insignificant.

■ We are persuaded that the trial court correctly discerned this legislative intent and properly applied it to the measure voted upon in the case before us. The only evidence of co-op ownership by the board members was the claim that each held one of the 600 outstanding membership shares. Such an interest obviously falls below the five percent ownership standard established by the legislature for voting on similar measures. In the absence of any other evidence pointing to bias or prejudice, the Helmkes failed to prove the existence of a conflict of interest and the district court was correct in so holding.

III. *Compliance with the Ruthven Zoning Requirements.* The Ruthven board of adjustment offered the following grounds for approval of a zoning compliance permit for the construction of the co-op's grain storage building: (1) the proposed facility would be a permitted use under article V, section 2, subsection 2.1 of the City of Ruthven Zoning Ordinance and (2) a permit would not be required under the "agricultural purpose" exemption of article II, section 2 of the Ruthven Zoning Ordinance.[1] To understand the propriety of the board's decision, a review of the ordinances in question and the specifics of the proposed facility is in order.

The disputed building is twenty feet high, measuring $66 \times 306$ feet on the ground, with a ten-foot grain liner for storing 250,000 bushels of grain. Filled to capacity by a portable elevator, the grain will remain in storage three to four years. No dryers were installed. However one three-horsepower fan and five twenty-five-horsepower fans, with baffles, were installed on the east side of the building (away from Helmkes) in order to cool the grain to thirty-nine degrees. Aside from weekly grain quality inspections, no other regular activity at the storage facility is contemplated once it is filled to capacity.

The facility was built on ground zoned as an "A–1 agricultural district" within the two-mile extraterritorial jurisdiction of the city of Ruthven.[2] In each zoning district under the Ruthven ordinance, there are *principal* uses permitted without special

---

1. The board also cited as a third ground the "essential services" exception of article V, § 3.6. The parties stipulated before trial, however, that a permit for the building could not be upheld on that ground under this record.

2. Iowa Code section 414.23 provides that municipal zoning powers may be extended by ordinance of any city to the unincorporated area up to two miles beyond the city limits. *See* Iowa Code § 414.23 and art. I, § 2, Ruthven Zoning Ordinance.

approval, and *special* uses which must have prior board approval to be permitted. Article V of the Ruthven zoning ordinance pertains to the principal and special uses permitted on land zoned as an A–1 agricultural district. Principal uses identified in Article V, section 2.1 include:

Agriculture including the raising of crops, horticultural uses, animal husbandry, poultry husbandry, and the *usual agricultural buildings* and structures, but excluding commercial auction yards and barns and commercial feedlots.

Ruthven, Iowa, Zoning Ordinance, art. V, § 2.1 (emphasis added.)

Upon approval of the board, the following special uses may also be permitted in A–1 agricultural districts:

Agricultural service establishments primarily engaged in performing agricultural, animal husbandry or horticultural services on a fee or contract basis including corn shelling, hay baling; horticultural services such as plant nurseries; landscape gardening, landscape contracting; farm equipment service and repair; veterinary services; commercial auction yards and barns; bulk storage of petroleum products for distribution or direct sales to agricultural consumers and fertilizer and farm chemical products.

*Id.* art. V, § 4.5.

Additionally, the Ruthven zoning ordinance contains a caveat applicable to the extraterritorial jurisdiction of Palo Alto county which states

no regulation or restriction adopted under the provisions of this Ordinance shall be construed to apply to land, farmhouses, farm barns, farm outbuildings, or other buildings, structures, or erections which are *primarily adapted by reason of nature and area, for use for agricultural purposes* while so used. . . .

*Id.* art. I, § 2 (emphasis added.)

This latter ordinance mirrors Iowa Code section 358A.2, which exempts such land and facilities from *county* zoning authority. It is expressly incorporated into section 414.23 which grants municipalities extraterritorial jurisdiction. The statute

thereby restricts the zoning authority of municipalities in such agricultural areas.

Given this statutory scheme, the co-op's grain storage building must either qualify as a "usual agricultural building" or a structure "primarily adapted, by reason of nature and area, for use for agricultural purposes." Ruthven, Iowa, Zoning Ordinance, art. V, § 2.1; Iowa Code § 358A.2. Helmkes claim that the building fails to meet the first test as a matter of law because it is not a "usual agricultural building" and under the Ruthven ordinance, grain storage facilities may only be located in the heavy industrial zoning district. Secondly, they claim the facility fits the "independent productive activity" standard established in *Farmegg Products, Inc. v. Humboldt County,* 190 N.W.2d 454 (Iowa 1971), thereby taking it out of the realm of agriculture. We shall briefly consider each argument in turn.

■ The crux of Helmkes' first argument is that a building of this size is not a "usual" agricultural building. We note, however, that the permitted structures under Ruthven's A–1 agricultural zoning district are limited by use, not size. In fact, the ordinance's only size regulations pertain to *minimums*—minimum lot area, minimum lot width, and minimum yard requirements. Helmkes' attempt to shift the focus from use to size is contrary to the general principle that zoning ordinances, as an exercise of police power delegated by the state to municipalities, must be strictly construed. *City of Lamoni v. Livingston,* 392 N.W.2d 506, 509 (Iowa 1986); *Anderson v. City of Cedar Rapids,* 168 N.W.2d 739, 742 (Iowa 1969).

■ Similarly unavailing is Helmkes' suggestion that the court erred as a matter of law by finding that a grain storage facility could be located in other than a heavy industrial zoning district. Indeed, "flour and grain storage and elevators" is a principal permitted use under the heavy industrial zoning district of the Ruthven ordinance. But such a zoning restriction is intended to apply to districts *within* the city limits, whereas the co-op's facility is located *outside* the city limits in an area

zoned A–1 agricultural. Moreover, the storage facility at issue is not an "elevator" nor does it involve the processing of grain into flour, uses contemplated under the heavy industrial zone. We find Helmkes' argument to the contrary unpersuasive when viewed in the light of the rule that ambiguity in a zoning ordinance should be resolved in favor of the unrestricted use by the owner and restrictions should not be extended by implication or interpretation. *Johnson v. Board of Adjustment*, 239 N.W.2d 873, 881 (Iowa 1976).

All of this discussion assumes arguendo that the city of Ruthven has *any* authority to restrict the co-op's right to locate a grain storage building outside the city limits in an A–1 agricultural zone. It is upon this question that the district court focused, concluding that it could not say as a matter of law that the co-op's facility did not come within the scope of the "agricultural purposes" exemption of section 358A.2. We agree.

The scope of the exemption has been most recently discussed by this court in *Farmegg Products Inc. v. Humboldt County*, 190 N.W.2d 454 (Iowa 1971). There the facility in question consisted of two 40 × 400 foot steel buildings designed for the raising, in confinement, of 80,000 chicks from birth to twenty-two weeks. The *Farmegg* poultry operation, proposed to be built on land zoned as a suburban residence district, was found by this court to be "organized and carried on as an independent productive activity and not as part of an agricultural function" which would entitle it to exemption from zoning under section 358A.2. *Id.* at 459. We derived the "independent productive activity" standard from *Farmers Reservoir & Irrigation Co. v. McComb*, 337 U.S. 755, 760–61, 69 S.Ct. 1274, 1277–78, 93 L.Ed. 1672, 1679–80, *reh'g denied*, 338 U.S. 839, 70 S.Ct. 31, 94 L.Ed. 513 (1949) wherein the United States Supreme Court, in an effort to define the term "agriculture" in the interpretation of the Fair Labor Standards Act, said:

> Agriculture, as an occupation, includes more than the elemental process of planting, growing and harvesting crops. There are a host of incidental activities which are necessary to that process. Whether a particular type of activity is agricultural depends, in large measure, upon the way in which that activity is organized in a particular society. *The determination cannot be made in the abstract.* * * * Thus, the question as to whether a particular type of activity is agricultural is not determined by the necessity of the activity to agriculture nor by the physical similarity of the activity to that done by farmers in other situations. The question is whether the activity in the particular case is carried on as part of the agricultural function or is separately organized as an independent productive activity.

Quoted in *Farmegg*, 190 N.W.2d at 458. (Emphasis supplied in *Farmegg*.)

Our decision in *Farmegg* has been roundly criticized, most notably by Professor Neil Hamilton in *Freedom to Farm! Understanding the Agricultural Exemption to County Zoning in Iowa*, 31 Drake L.Rev. 565, 569–75 (1982), but by other jurisdictions as well. *See County of Lake v. Cushman*, 40 Ill.App.3d 1045, 353 N.E.2d 399, 404 (1976). The thrust of the criticism, however, seems directed at the "agricultural/commercial" distinction implicit in *Farmegg* as it bears on the raising and feeding of livestock, an issue not before us in this case.

Applying the "independent productive activity" test to the grain storage facility at issue, Helmkes assert that the agricultural exemption should not be available because the co-op neither plants, cultivates nor harvests the crops therein stored. Such an observation, though technically accurate, limits too narrowly the definition of agriculture. Even in *Farmegg* we defined agriculture more broadly, embracing the idea that incidental activities necessary to agriculture as an occupation include more than the elemental process of planting, growing and harvesting crops. *Farmegg*, 190 N.W.2d at 458 (quoting *Farmer's Reservoir*, 337 U.S. at 760–61, 69 S.Ct. at 1277–78, 93 L.Ed. at 1679–80). As we observed in a similar vein:

The determination of where agriculture stops and commercial processing begins is not easy. ... Grains must be harvested, and fruits and vegetables must be garnered and put in condition for marketing; and these are properly a part of agriculture.

*Crouse v. Lloyd's Turkey Ranch,* 251 Iowa 156, 161, 100 N.W.2d 115, 118 (1959). In *Crouse* we drew the line between the raising and marketing of poultry on the one hand and the operation of a processing plant on the other. We found the former reasonably characterized as an agricultural pursuit but not the latter. *Id.* at 162–63, 100 N.W.2d at 119.

▆ So also are we asked to draw such a line here. The evidence before the district court revealed that this grain storage facility was built in 1985 as a supplement to the farm members' "on farm" storage facilities which were insufficient to hold the season's harvest. Viewed in this light, this grain storage could reasonably be characterized as part of a farming continuum which begins with the planting of the crop and continues through its cultivation and harvesting. The construction of the storage facility was thus not an "independent productive activity," but "part of the agricultural function." *Farmegg,* 190 N.W.2d at 458; *see also Maneja v. Waialua Agricultural Co.,* 349 U.S. 254, 260, 75 S.Ct. 719, 723, 99 L.Ed. 1040, 1050–51 (1955) (agriculture includes "preparation for market, delivery to storage or to market or to carriers for transportation to market.")

More importantly, whether the evidence in a close case such as this one might well support an opposite finding is of no consequence, for the district court cannot substitute its judgment for that of the board of adjustment. *Weldon v. Zoning Bd.,* 250 N.W.2d at 401. We have found substantial support in the record for the findings of the trial court which upheld the board's decision. Like the district court, we cannot say as a matter of law that the board of adjustment erred in its determination that the co-op's grain storage building qualified for the "agricultural purpose" exemption.

Accordingly, we affirm the judgment of the district court.

AFFIRMED.

All Justices concur except SCHULTZ, CARTER and SNELL, JJ., who dissent, and ANDREASEN, J., who takes no part.

SCHULTZ, Justice (dissenting).

While I have doubts about the validity of the votes by the five members of the board of adjustment with a financial interest in the outcome of their decision, I confine my dissent to the issue of whether an agricultural exemption was legal in this case.

The Co-op sought an exemption for this building only after construction was already underway. The building is over one hundred yards long and twenty feet high and houses a quarter of a million bushels of corn. It is located on a six-acre parcel of property outside the city, directly across from the plaintiffs' residence. The Co-op also operates a lumber yard, sells fertilizer chemicals, seed and feed. It also stores corn for its own operation and for farmers. It plans to use the structure in question for storing corn in the building for a number of years, and then use it as a machine shed.

This use is not for agricultural purposes. It is unlike a storage facility owned by a farmer to accommodate his agricultural operation. *See Farmegg Products, Inc. v. Humboldt County,* 190 N.W.2d 454, 459 (Iowa 1971). The Co-op is engaged in doing business with farmers rather than farming. They are not unlike the local farm implement store. The use of this building is closer to the use of a grain barge on the Mississippi River than the use of "the usual agricultural building" in this zoning district.

The purpose of zoning regulations is to protect the general well-being of others by prohibiting uses that would be injurious to others. Plaintiffs had a right to expect

that the adjoining property could be used for agricultural purposes. They should not be required to have their view destroyed by this massive commercial building and be subjected to the loading and unloading of this huge quantity of grain. In allowing this, the board acted illegally.

CARTER and SNELL, JJ., join this dissent.