**W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**TI TI PEAT HUMUS COMPANY, Inc., a Corporation, Defendant.**

**Civ. A. No. 7953.**

United States District Court
D. South Carolina,
Charleston Division.

Jan. 14, 1966.

Charles Donahue, Sol., Beverley R. Worrell, Regional Atty., Roger J. Martinson, Atty., U. S. Dept. of Labor, for plaintiff.

Charles H. Gibbs, Sinkler, Gibbs & Simons, Charleston, S. C., for defendant.

SIMONS, District Judge.

Plaintiff instituted this action to enjoin defendant from violating the provisions of Section 15(a) (1) and 15(a) (2) of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C.A. § 201 et seq., hereinafter referred to as the Act. The court has jurisdiction pursuant to Section 17 of the Act.

In his complaint plaintiff alleges that defendant has heretofore employed and is now employing approximately six employees in and about its place of business at a locality known as Green Pond in Colleton County, South Carolina, in mining, pulverizing, processing, and otherwise working on, and bagging peat humus; and in selling and distributing the same to points outside the State of South Carolina; and that said employees are engaged in commerce and in the production of goods for commerce within the meaning of the Act. Plaintiff further alleges that during the period since June 26, 1960 defendant has violated, and is violating, Sections 7 and 15(a) (2), the overtime provisions of the Act; and that during the period since June 26, 1960, defendant has violated Sections 6 and 15(a) (2), the minimum wage provisions of the Act. Plaintiff seeks to enjoin such alleged violations under Section 17 of the Act. In its answer defendant admits generally the allegations of the complaint, but denies that plaintiff should be granted an injunction. Defendant also sets up the affirmative defense that its said employees are exempted from the foregoing sections of the Act, under either or both of the exemptions afforded by the agricultural exemption [Section 13(a) (6)]; or the area of production exemption [Section 13(a) (10)]. Defendant also asserted the affirmative defense based upon the forestry exemption provided by Section 13(a) (15) of the Act, which was voluntarily abandoned at the trial.

At the commencement of the trial, defendant by stipulation conceded that it had not paid its employees in accordance with the minimum wage and overtime provisions of the Act, and rested its defense upon its affirmative defenses that it was exempted from the Act's coverage. Thus the sole issues to be determined by the court are: (1) Whether defendant's employees are exempted from the cover-

age of the Act; and (2) if not, should injunction be granted restraining defendant from further violation of the Act.

The case was tried before me without a jury on July 12, 1965 at Charleston, South Carolina. In compliance with Rule 52(a) Federal Rules of Civil Procedure, I find the facts specially and state my conclusions of law thereon.

## FINDINGS OF FACT

1) Defendant is a South Carolina Corporation, organized during 1955 with its principal and only place of business near Green Pond, Colleton County, South Carolina, within the jurisdiction of this court. For some time prior to September 3, 1961, and during the period since that date employees of the defendant have been and are now engaged in commerce, or the production of goods for commerce, within the Act. Since September 3, 1961, its employees have been paid by defendant at hourly rates less than the minimum wages required by the Act; and were compensated for their overtime hours [the hours by which their employment exceeded 40 hours per workweek] at the rate of one and one-half times such sub-minimum rates, in violation of the overtime provisions of the Act. The defendant regularly ships goods produced by its employees to points outside the State of South Carolina.

2) About the year 1945 C. T. Cummings, who is now President of defendant, acquired approximately 3,500 acres known as Creighton Hill Plantation in Colleton County. Sometime later it was determined that a portion of this acreage contained valuable peat or peat humus in sufficient quantities that such could be commercially harvested and sold. Mr. Cummings, after the formation of defendant corporation, leased 2,000 acres of his tract to it, and the lease has recently been extended for an additional ten-year period.

3) During the past ten years the peat has been gathered and harvested from a portion of the tract by the use of spring tooth harrows, rotor tillers, frontend loaders, and farm tractors. Prior to gathering of the peat, the tract was generally covered with trees, brush, and various species of weeds and grasses. Most of the area was damp, low lying land covered with surface waters. Prior to the harvesting operation, it was necessary to drain the area and clear the lands of all growth and vegetation. Defendant constructed roadways, a railroad siding, drainage ditches, and a processing and packaging plant.

4) During the past several years defendant's operations have been hampered by excessive rainfall, which has caused several interruptions and difficulties. It has not proved to be a profitable venture, as none of its ten stockholders has received any dividends in the history of the company, and no officer of the company has been paid a salary. Mr. Cummings, as lessor, has not received rent or compensation for the lease of his peat bearing lands as provided for in his lease with defendant.

5) No seasonal crops are planted or cultivated on any portion of the 2000 acres leased by defendant from Mr. Cummings, and it produces or deals in no other commodity or product other than peat. Neither has it during the period of the operation planted or cultivated any growing plants such as mosses, reeds and sedges from which the peat deposits were formed and accumulated.

6) The plant site is in a remote area of Colleton County, twenty-five to thirty miles from Walterboro, the closest incorporated town, whose population is 5,417 by the 1960 census. This meets the Area of Production requirements in the exemption provision [Section 13(a) (10)] of the Act for agricultural and horticultural commodities as defined by the Secretary. [29 C.F.R. 532.2].

7) In fiscal year 1964 net sales by defendant amounted to just under $79,-730.40. Labor costs for a plant or bog manager and for field and plant employees amounted to $29,247.67 for this period. Through the testimony of Mr. Cummings, its President, defendant has assured the court that, in the event its

employees are found not to be exempt from the Act it will either comply .fully with the provisions of the Act in its future operations, or it will go out of business completely. It asserted its financial inability to make any back payments found due to its employees.

8) The peat or peat humus is gathered by defendant from an area described as a wet meadow or a bog, which is in general waterlogged, wet and full of moisture, and must be drained and cleared of underbrush and all growing vegetation before any harvesting of peat is commenced. After the bog has been adequately drained and cleared, the peat is then ready for harvesting or gathering. This is accomplished by plowing the bog or field with spring tooth harrows and rotor tillers to loosen and till the peat so that it can be air-dried and loaded by a frontend loader onto tractor-drawn dump carts; then it is carried to the plant to be screened for roots, and then bagged or loaded into trucks for bulk shipment. Other than screening out the roots, no further processing or treatment is required, nor is it necessary to add any substance to the peat.

9) Defendant's deposit of peat covering approximately 40 acres is composed of decaying and decayed plants such as reeds, sedges, red root, baze, southern smilax, pine, pine straw, bay and laurel trees, and many other botanical specimens including various types of mosses, some of which have apparently been recently growing, and others which have been decayed, accumulated, and preserved in the waterlogged area over a period of several hundred years. Reeds, mosses, and sedges are the principal and dominant reproducing vegetation in the Ti Ti bog, and their roots contribute to the total organic matter. This material is accumulated in waterlogged areas down to a depth of 16 feet in some places, and is subject to very slow decomposition under water. As a general rule there will be living matter growing on top of the bog, and immediately below that the decayed matter which has been alive a short time previously. The peat is laid down annually, the bottom level being the older strata and the top strata being only a few years old. The peat has living organisms in it such as bacteria and fungi.

10) The chemical properties of the peat in question do not vary according to the depth at which the peat may be found, since defendant's is a uniform bog; and analyses made over a period of ten years show the same to be about 97% vegetable organic matter, and about 3% mineral ash, the latter being principally a siliceous substance commonly known as inert sand.

11) The chief uses of peat in agricultural and horticultural pursuits is in soil conditioning, since it gives lightness to a heavy soil, and waterholding capacities to light, sandy soil. The use of peat also stimulates plant growth and the rooting of plants, the development and growth of leaves and leaf color; and is used extensively as potting material for plants in greenhouses, and as protection for plants and flowers in shipment.

12) Defendant's peat deposit was undoubtedly formed entirely from vegetation and its progressive decomposition through the years, in a saturated natural environment such as a bog, stagnant pond, marsh, or the like. It is in such surroundings that the mosses, reeds and sedges propagate and grow in masses and form peat humus. The accumulation is marked by two characteristics: First, because of the saturated conditions in which such plants grow, and to some extent because of the absorbent qualities of the plant material, water covers and thereby affects the rate of decomposition of the plants. The water in these saturated surroundings cuts off oxygen and prevents total oxidation or decomposition. Secondly, such plants have hyaline cells which absorb water, thus aiding in the prevention of total oxidation or decomposition. The accumulation of these plants in such saturated environment, which is very slow to oxidize or decompose as above described, grows and develops at an estimated rate of about one foot per five hundred years. Naturally, in the accumulation of such mosses, sedges and

reeds under such environment giving rise to peat humus, other type plants than those enumerated which form the peat also become a part of the accumulation in limited numbers and species. Since defendant's deposit extends to depths down to sixteen feet, it is evident that it has been many centuries in growth and development.

■ 13) Although not controlling of the issues in this case, it is interesting to note that defendant's activity under South Carolina Law has been classified as a farming operation and has been exempted from the South Carolina sales and use tax. Further, interstate truck transportation of peat has been exempted as an agricultural and horticultural commodity under the provisions of the Interstate Commerce Act [49 U.S.C.A. 303(b) (6)], by a three judge court in the Southern District of New York in Premier Peat Moss Corporation v. United States, D.C., 147 F.Supp. 169, aff'd. I. C. C. v. Premier Peat Moss Corp., 355 U.S. 13, 78 S.Ct. 16, 2 L.Ed.2d 21. The effect of this decision has created keen competition for defendant and other peat producers in this area from imported peat and from northern markets which enjoy the benefits from "back haul" freight rates from produce truckers in the large industrial areas, while defendant is not so located geographically that it can obtain the bargain "back haul" rates, and is thus being undersold by its competitors.

14) Defendant presented two well qualified experts at the trial, Dr. Rouse S. Farnham, an Ohio State University Ph. D. graduate in soil science [formation of soils] who worked for several years with the Soil Conservation Service of the federal government; and Dr. T. L. Senn, Ph. D., head of Department of Horticulture at Clemson University. Both of these witnesses expressed their opinions that peat and peat humus were agricultural or horticultural commodities.

15) Plaintiff's expert who testified in reply was Dr. S. L. Doerbinghaus, Associate Professor of Biology at Agnes Scott College in Atlanta, Georgia, who majored in chemistry and genetics. In his opinion peat is not an agricultural or horticultural commodity, but is a substance which fits into a mineral sequence in the broad sense, such as coal or lignite. Clifton L. Holmes, a research economist of the Wage-Hour Division of the Department of Labor testified that he had done considerable research and study concerning peat moss and peat production for his Department, and had compiled documentary evidence to substantiate plaintiff's position.[1] Holmes also opined that peat was not an agricultural or horticultural commodity.

■ 16) The court is thus confronted with the usual dilemma resulting from the contradictory and unreconcilable testimony and opinions based thereon of the "so-called" experts of opposing parties. However, after a careful study of the testimony and the relevant evidence before the court which has been briefly set forth hereinabove, I find and conclude that peat and peat humus are in fact agricultural or horticultural commodities within the meaning of the Act.

17) Prior to the effective date of the 1961 amendments to the Act, which increased the minimum wage, defendant was in compliance with provisions of the Act relating to wages, as an investigation of defendant during the year 1958 disclosed only one violation of the record-keeping provision of the Act as to one employee only.

Following the passage of the 1961 amendment, defendant began to make inquiries about the effect upon its operation of the Premier Peat Moss decision, supra, because it felt it could not pay the increased wages and continue its operations. Defendant was again examined during 1962 by a Mr. Bolen, representa-

1. The summary of Holmes' research which was objected to by defendant was permitted to be tendered for the record under Rule 43(c) of Federal Rules of Civil Procedure. Although I ruled that such was inadmissible I have considered it in my study and determination of the issues of the case.

tive of plaintiff, who stated that he agreed with defendant's interpretation that peat was an agricultural product, but that he was bound by the Administrator's interpretation to the contrary. At that time, the investigators indicated that the question could best be resolved by a judicial determination. Under such circumstances, and upon advice of counsel, defendant continued to claim that its operation was exempted from the Act. This suit was instituted shortly thereafter in early January 1963 by plaintiff.

■ 18) Under all the attendant circumstances, I find that defendant has acted throughout in complete good faith, and that its failure to comply with the Act was justified. There existed a bona fide dispute upon which fairminded persons could disagree and reach different conclusions. Defendant's officers have assured the court of its full compliance with the Act should it be determined herein that it is not entitled to the claimed exemption; and the court is thoroughly convinced that such will be the case.

## CONCLUSIONS OF LAW

1) The court has jurisdiction of the parties and subject matter of this action. 29 U.S.C.A. § 217.

2) Section 3(f) of the Act [29 U.S.C. A. § 203(f)] defines agriculture to include "farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities (including commodities defined as agricultural commodities in Section 1141j(g) of Title 12), the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market."

3–a) The exemptions within which defendant claims its operation comes are incorporated in Section 13(6) and 13(10) respectively in the Act [29 U.S.C.A. § 213(a) (6) and 213(a) (10)] as follows:

"(a) The provisions of sections 206 and 207 of this title shall not apply with respect to— * * *

"(6) any employee employed in agriculture or in connection with the operation or maintenance of ditches, canals, reservoirs, or waterways, not owned or operated for profit, or operated on a share-crop basis, and which are used exclusively for supply and storing of water for agricultural purposes; or * * *

"(10) any individual employed within the area of production (as defined by the Secretary), engaged in handling, packing, storing, compressing, pasteurizing, drying, preparing in their raw or natural state, or canning of agricultural or horticultural commodities for market, or in making cheese or butter or other dairy products; or * * *."

3–b) The area of production is defined by the Secretary in regulations set forth in 29 C.F.R. § 536.2 as follows:

"(a) An individual shall be regarded as employed within the 'area of production' within the meaning of section 13(a) (10) [29 U.S.C.A. 213(a) (10)] of the Fair Labor Standards Act * * *:

"(1) If the establishment where he is employed is located in the open country or in a rural community and 95 percent of the commodities on which such operations are performed by the establishment come from normal rural sources of supply located not more than the following airline distances from the establishment: * * *

"(ii) With respect to the storing of cotton and any operations on commodities not otherwise specified in this subparagraph—20 miles; * * *

"(b) For the purposes of this section:

"(1) 'Open country or rural community' shall not include any city, town, or urban place of 2,500 or greater population, or any area within:

"(i) One air-line mile of any city, town, or urban place with a population

of 2,500 up to but not including 50,000, or * * * "2

4) The Fair Labor Standards Act is social legislation to be liberally construed so as to effect broad coverage. It is well settled that in establishing an exemption of its employees from the coverage of Section 213 of Title 29, an employer asserting such exemption has the burden of proving "plainly and unmistakenly" that its employees are exempt, and the provisions of the exemption sections are to be narrowly construed against exemptions. Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 80 S.Ct. 453, 4 L.Ed.2d 393 [1960]; Walling v. General Industries Co., 330 U.S. 545, 67 S.Ct. 883, 91 L.Ed. 1088 [1947]; Pugh v. Lindsay, 206 F.2d 43 [4th Cir. 1953].

5) Defendant's deposit of peat is of vegetable origin and has been shown by chemical analyses over the last several years to contain about 97 percent vegetable organic material. The determination as to whether defendant's peat is an agricultural or a horticultural commodity resolves upon mixed questions of law and fact, and must be determined upon consideration of all relevant circumstances. From the court's factual determinations, with particular emphasis upon the origin of the peat and defendant's manner of harvesting the same, and from my interpretation of the pertinent provisions of the Act, I conclude that defendant's employees are "employed in agriculture" as defined by Section 3(f) of the Act, supra, and are exempted from coverage under the Act pursuant to Sections 13(6) and 13 (10) of the Act, supra. Although the case of Premier Peat Moss Company v. United States, supra, deals with an exemption under Section 303(b) (6) of Title 49 U.S.C.A. [Interstate Commerce Act] I have found such opinion to be the most persuasive judicial determination in assisting the court in deciding the primary issue in the instant case. In Premier the question before the court was whether the Interstate Commerce Commission was correct in ruling that peat moss is not an "agricultural" commodity within said Section 303(b) (6).3 Although a different federal act was involved in that case the issues and contentions of the parties were primarily the same as in our case, and the evidence adduced there was strikingly similar to that here. Likewise the Congressional intent for such exemption under Interstate Commerce Act was closely akin to the purpose for granting agricultural exemption under Fair Labor Standards Act to benefit the farmer.4 In reversing the

2. The design of Congress in adopting these exemptions is expressed by the United States Supreme Court in Mitchell, Secretary of Labor v. Budd, et al., 350 U.S. 473, at page 478, 76 S.Ct. 527, at page 530, 100 L.Ed. 565 [1956] as follows: "The aim of Congress was to exempt employees 'employed in agriculture', § 13(a) (6), and those engaged in agricultural enterprises in the 'area of production', § 13(a) (10). That meant drawing a line between agricultural enterprises operating under rural-agricultural conditions and those subject to urban-industrial conditions. An individual working in an agricultural packing plant on the edge of Los Angeles is in a strikingly different environment from one doing the same work in a small town in the heart of Kansas. Nearness to a large city has relation to the problem of the Administrator in making his definition. For the proximity of the plant to a metropolitan center, like the size of the town where the plant is located, may make the decisive difference between an agricultural and an urban environment. Likewise, nearness of the plant to its supplies cannot be considered an irrelevancy. For 'area' is understandable in terms of nearness and farness. Distance is an important factor in any formula which seeks to treat more or less as a unity labor on farms and labor in agricultural enterprises in the 'area of production'".

3. 49 U.S.C.A. Section 303(b) declares: "Nothing in this chapter * * * shall be construed to include * * * (6) motor vehicles used in carrying property consisting of ordinary livestock, fish (including shell fish), or agricultural (including horticultural) commodities * * *."

4. See East Texas Motor Freight Lines v. Frozen Food Express, 351 U.S. 49, 76 S.Ct. 574, 100 L.Ed. 917 [1956] wherein the Supreme Court states: "The exemption of motor vehicles carrying 'agricultural (including horticul-

Commission's determination that peat was not an agricultural commodity so as to be exempted under the agricultural exemption and finding that peat was exempted as an "agricultural commodity" the court, 147 F.Supp. at page 174, stated:

> "Indubitably peat moss is of vegetable origin. It is 'produced by nature from what was once vegetation, and chemically it is substantially the same as the vegetation from whence it is derived. In fact, its chief characteristic results from the fact that nature itself has arrested any substantial change which without the protection of water would otherwise have taken place. Its principal uses, too, are either agricultural or horticultural.'

> "The defendants urge that peat moss is unlike any commodity produced on a farm and is more in the nature of coal. But in the case of coal, although in origin derived from vegetation, the processes of nature have converted it into a mineral. Not so in the case of peat moss. There the processes of decay have not progressed far enough to cause any substantial change in its original chemical content."

It is interesting to note that Premier Peat Moss Company's contention that peat moss was an agricultural commodity was supported by the Secretary of Agriculture who filed a brief without formally intervening. It would indeed be anomalous and quite confusing, to say the least, for the court to determine that peat at its source is not an agricultural or horticultural commodity, but that while being subsequently transported in interstate commerce it then became an agricultural or horticultural commodity.

6) In an unreported decision by District Judge Bascom S. Deaver of the Middle District of Georgia dated May 21, 1943 in Walling v. Georgia Peat Moss Company, wherein the issues were somewhat similar to those in this case, the court held that "the exemptions claimed are not applicable in the business carried on by defendant". A copy of the record in the Georgia Peat Moss case, including the complaint, answer, findings and conclusions, was furnished to the court and has been carefully considered. There appear to be considerable factual distinctions between that case and the case at bar. In addition, the opinion of Judge Deaver indicates that defendant therein was forced to trial at the instance of the Administrator, in the absence of its operators who had been inducted into the Armed Forces, and the plant had been closed for some time. Under such circumstances I am unable to accord much weight or authority to that decision. It was sorely lacking in the strenuous adversary tactics generally found in contested cases, and at time of hearing had apparently taken on the attributes of a moot issue.

7) I am unable to agree with plaintiff and his expert witnesses in their contention that peat is a mineral in the broad sense, such as coal or lignite. See United States v. Toole, 224 F.Supp. 440 [D.C. Mont.1963]. It has undergone no substantial metamorphosis or change in its original chemical content.

8) Inasmuch as I have concluded that defendant's peat is an agricultural or horticultural commodity, and that its employees engaged in the gathering, harvesting and processing such commodity for shipment in interstate commerce are exempt under the provisions of the Act, plaintiff's complaint should be dismissed. However, for the purposes of the record I hold and conclude that even if defendant's said employees were not exempt from the coverage of the Act, and that defendant was in violation of the minimum wage and overtime provisions

tural) commodities (not including manufactured products thereof)' was designed to preserve for the farmers the advantage of low-cost motor transportation."
See also note 2, supra.

thereof, I would refuse to issue an injunction under the facts and circumstances of this case, especially in view of the representations and assurances of defendant's managing officers that the defendant will fully comply with all of the provisions of the Act in its future operations should the court determine that its employees were not exempt from the provisions of the Act. The court is well aware that every violation of the Act does not necessarily require the issuance of an injunction, which is a drastic remedy, not to be invoked as a punitive measure but only to be used to insure future compliance with the law, as was so clearly stated by the Fourth Circuit in Walling v. Clinchfield Coal Corporation, 159 F.2d 395 [4 Cir., 1946]:

> "There can be no question but that the usual equity rules applicable to injunctions are to be regarded in considering an application for that remedy under the Act [Fair Labor Standards Act]. Fleming v. Phipps, D.C., 35 F.Supp. 627. For, as was said in Walling v. Associated Truck Lines, D.C., 57 F.Supp. 943, 945: 'The rule is well settled that the extraordinary writ of injunction will not issue for the purpose of punishing past offenses, but *will issue only in those cases where the court is convinced that such relief is necessary to prevent future violations.'*" [Emphasis added].

Plaintiff has failed to convince the court that the defendant has acted at any time in bad faith or in such a wilful manner as to warrant the application of drastic sanctions against it. There was ample ground for an honest difference of opinion in the interpretation of the provisions of the Act as construed by plaintiff and the factual circumstances of this case.

In accordance with the foregoing findings of fact and conclusions of law, it is

Ordered that plaintiff's complaint be dismissed; and that his prayer for injunctive relief be, and the same is hereby, denied.