W. Willard WIRTZ, Secretary of Labor,
United States Department of Labor,
Appellant,

v.

TI TI PEAT HUMUS COMPANY, Inc.,
a corporation, Appellee.

No. 10685.

United States Court of Appeals
Fourth Circuit.

Argued Dec. 6, 1966.

Decided Feb. 6, 1967.

William Fauver, Attorney, United States Department of Labor (Charles Donahue, Sol. of Labor, Bessie Margolin, Associate Sol., Donald Shire, Attorney, and Beverley R. Worrell, Regional Attorney, United States Department of Labor, on brief), for appellant.

Charles H. Gibbs, Charleston, S. C. (G. Dana Sinkler and Sinkler, Gibbs & Simons, Charleston, S. C., on brief), for appellee.

Before BOREMAN, BRYAN and CRAVEN, Circuit Judges.

BOREMAN, Circuit Judge:

The Secretary of Labor seeks, under section 17 of the Fair Labor Standards Act (hereinafter Act), to enjoin the defendant, Ti Ti Peat Humus Company, Inc., from future violations of the minimum wage, maximum hours, overtime, and record-keeping requirements of the Act. The defendant contends that it is excused from complying with these provisions of the Act by virtue of the agricultural exemption hereinafter noted. The District Court, in a trial without a jury, held that peat humus (the term

apparently being used interchangeably with "peat moss") is an agricultural commodity within the meaning of the exemption provision of the Act and denied the Secretary's request for an injunction.[1] The Secretary appeals and we reverse the decision below.

The defendant (hereafter "company") is a South Carolina corporation with its sole and principal place of business near Green Pond, Colleton County, South Carolina. Since 1956, the company has been actively engaged in extracting, processing, packing and selling peat humus and shipping it in interstate commerce. The peat deposit is located on forty acres of a 2,000-acre tract of land which the company leases from its president. The company has six employees who are employed on a full-time basis except when interruption of operations is occasionally necessitated by adverse weather conditions.

In 1961 the company, because its enterprise was proving unprofitable, decided that it would be unable to pay its employees the minimum rates established by a then recent amendment to the Act. It then began and continued to pay wages at rates less than those prescribed for both a regular forty-hour week and for overtime in excess of forty hours. In 1963 the Secretary instituted proceedings to enjoin future violations. The District Court, after hearing conflicting testimony of four experts, two of whom expressed the opinion that peat was an agricultural commodity and the other two expressing a contrary opinion, decided that peat was an "agricultural commodity" and that the business of harvesting and marketing the peat was exempt from the minimum wage, overtime and record-keeping requirements of the Act.

The Secretary urges that the legislative history, the administrative interpretation and subsequent congressional and administrative treatment of the Act in general and the agricultural exemption in particular indicate that Congress did not intend that the peat industry or those engaged therein should come within the exemption. Section 13 of the Act provides:

"(a) The provisions of Sections 6 and 7 [minimum wage and maximum hours sections] shall not apply with respect to * * * (6) any employee employed in agriculture * * * or (10) any individual employed within the area of production (as defined by the Secretary), engaged in handling, packing, storing, compressing, pasteurizing, drying, preparing in their raw or natural state, or canning of agricultural or horticultural commodities for market, * * *." 52 Stat. 1067, 29 U.S.C. § 213(a) (6), (10).

"Agriculture" as defined by section 3(f) of the Act "includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities (including commodities defined as agricultural commodities in section 15(g) of the Agricultural Marketing Act, as amended), the raising of livestock, bees, fur-bearing animals, or poultry, and any practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market." 52 Stat. 1060, 29 U.S.C. § 203(f).

■ Clearly, the company is not engaged in what is known as the "secondary meaning" of "agriculture" since the operation is not done by a farmer or on a farm.[2] If the exemption is to apply the company must prove that it comes within the "primary meaning" of agriculture which includes "among other things, the cultivation and tillage of the soil * * * the production, cultivation, growing and harvesting of agricultural commodities

1. Wirtz v. Ti Ti Peat Humus Company, 249 F.Supp. 166 (D.C.S.C.1966).

2. Farmers Reservoir and Irrig. Co. v. McComb, 337 U.S. 755, 765, 69 S.Ct. 1274, 93 L.Ed. 1672 (1948), pointed out this distinction in section 3.

* * *." The question is thus reduced to a determination of whether the company's employees are engaged in any of these activities.

The method of operation here followed is not complex. These peat deposits are found in a watery or marshy area or bog of some 40 acres located on the leased 2000-acre tract. The court below found that the deposits are "composed of decaying and decayed plants such as reeds, sedges, red root, baze, southern smilax, pine, pine straw, bay and laurel trees, and many other botanical specimens including various types of mosses, some of which have apparently been recently growing, and others which have been decayed, accumulated and preserved in the waterlogged area over a period of several hundred years." [3] The court further found that the chemical property of the peat was 97% vegetable and organic matter and 3% mineral ash; that the company plants no seasonal crops, nor does it cultivate any portion of the leased 2000 acres or produce or deal in any product or commodity other than peat; that the company had not planted or cultivated any growing plants which would contribute to the accumulated vegetation in the bog.

We next consider the question as to whether the company's operation might come within the *production* of agricultural commodities provision of the Act. The method of collecting and preparing the peat for market is a rather rudimentary operation. The land is drained, cleared of trees and other growth and the peat is taken from the surface by means of various mechanical implements such as harrows, tillers, front-end loaders and tractors. The peat is then transported to the company's nearby plant, screened and bagged or loaded onto trucks for bulk shipment.

Peat is used primarily as a soil conditioner, and only secondarily as a fertilizer since it possesses some qualities tending to stimulate plant growth. At face it might appear that this operation under consideration amounts to "production" of an agricultural commodity within the meaning of the Act but the Secretary cogently argues that the term "production" has a very special and limited application to the production of turpentine and gum rosins. In fact, the Secretary's contention is supported by Farmers Reservoir & Irrig. Co. v. McComb.[4] The Supreme Court, in holding that a corporation which collected water and furnished it to farmers did not qualify for an agricultural exemption, stated that the "production" provision of the Act was added "to take care of a special situation—the production of turpentine and gum rosins by a process involving the tapping of live trees." [5]

The administrative treatment of peat indicates that it is not an agricultural commodity. In 1943 the Administrator of the Wage and Hour Division declared that the term "agricultural and horticultural commodities" means "commodities which are planted and cultivated by man," and "since peat is not such a commodity the exemption does not apply to employees engaged in extracting, processing and distributing peat moss." [6]

The Secretary points out that as early as 1940 northern peat marketers applied for, and were granted an exemption from the Act under section 7(b) (3) which exempts certain "seasonal industries." They were unable to operate during winter months. Defendant, because of its geographic location, is not eligible for the "seasonal industry" exemption granted to the northern peat companies.[7] But the fact that such an exemption was sought is strong evidence indicating that neither Congress nor the peat industry considered the agricultural exemption applicable.

3. 249 F.Supp. at 169.

4. 337 U.S. 755, 69 S.Ct. 1274 (1949); see McComb v. Super-A Fertilizer Works, 165 F.2d 824 (1 Cir. 1948), and H.R.Rep. No. 2738, 75th Cong., 3d Sess. 29.

5. 337 U.S. at 765, 69 S.Ct. at 1279.

6. C.C.H. Labor Law Reporter, Wages-Hours, ¶ 25,243.73.

7. 5 F.R. 4916 (Dec. 6, 1940).

In a previous decision under the Act here being considered, Walling v. Georgia Peat Moss Co.,[8] it was held that peat was not an "agricultural commodity." The court below held that because of extraordinary circumstances in *Walling,* including the lack of strenuous adversary tactics therein, it could not accord this decision persuasive weight. The court relied, instead, on Premier Peat Moss Corp. v. United States,[9] holding that peat moss is an agricultural commodity within the meaning of the agricultural exemption of the Interstate Commerce Act. 49 U.S.C. § 303(b). The *Premier* decision appears to be based on the fact that peat is primarily vegetable in composition and this reasoning obviously influenced or dictated the lower court's disposition of the instant case.

The Secretary points out that in 1949, upon the amendment of the Fair Labor Standards Act, Congress, with full knowledge of the administrative construction and application of the Act as to peat moss, stated that any existing "order, regulation or interpretation of the Administrator of the Wage and Hour Division or of the Secretary of Labor * * * shall remain in effect * * * except to the extent that [it] may be inconsistent with the provisions of this Act." 63 Stat. 910, 29 U.S.C. § 208. It certainly appears, as the Secretary urges, that Congress by employing this language with full knowledge of the Secretary's treatment of peat moss, intended that peat should not fall within the agricultural exemption.

■■■ The holding in *Premier Peat Moss,* 147 F.Supp. 169, supra, is certainly not controlling in this situation, nor do we find it persuasive authority. The Interstate Commerce Act was not drafted to meet the problems which confronted the authors of the Fair Labor Standards Act. The purpose of the latter was to correct and eliminate "conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers * * *." 52 Stat. 1060, 29 U.S.C. § 202(a); Brooklyn Savings Bank v. O'Neil.[10] Remedial social legislation of this nature is to be construed liberally in favor of the workers whom it was designed to protect, and any exemption from its terms must be narrowly construed. Phillips Inc. v. Walling.[11] The stated purpose of the Interstate Commerce Act is "to provide for fair and impartial regulation of all modes of transportation * * * to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation among the several carriers * * *." 54 Stat. 899. While the Interstate Commerce Act states that fair wages and equitable working conditions are to be encouraged, it takes no steps to implement this expression of hope and it appears that this is, at most, a statement of a secondary purpose.

Finally, if the stated policy of the Act here involved, its legislative history and subsequent legislative and administrative treatment are not convincing we look to judicial pronouncements in cases which are not without pertinency. In Farmers Reservoir & Irrig. Co. v. McComb,[12] the Supreme Court held that employees who worked for a farmer cooperative corporation which collected water and supplied it to the member farmers for irrigation purposes, were not engaged in agriculture within the meaning of section 13(f) of the Act. The Court noted that as an economy becomes more sophisticated a division of labor follows and that what once was considered farming or agriculture is no longer so. The Court, taking note of the tremendous technological ad-

8.  7 Lab.Cas. ¶ 61,622 (M.D.Ga.1943).

9.  147 F.Supp. 169 (S.D.N.Y.1956) aff'd. 355 U.S. 13, 78 S.Ct. 16, 2 L.Ed.2d 21 (1957).

10. 324 U.S. 697, 65 S.Ct. 895, 89 L.Ed. 1296 (1945).

11. 324 U.S. 490, 493, 65 S.Ct. 807, 89 L.Ed. 1095 (1945).

12. 337 U.S. 755, 69 S.Ct. 1274, 93 L.Ed. 1672 (1949).

vances in the field of agriculture, remarked that

> "the question as to whether a particular type of activity is agricultural is not determined by the necessity of the activity to agriculture nor by the physical similarity of the activity to that done by farmers in other situations. The question is whether the activity in the particular case is carried on as part of the agricultural function or is separately organized as an independent productive activity." [13]

In applying this test to the instant case we are fully cognizant of the relationship of peat to agriculture but the conduct of defendant's business is independent of any agricultural activity or farming and we find in these circumstances support for our ultimate conclusion that there is no entitlement here to the agricultural exemption.

Similarly, in McComb v. Super-A Fertilizer Works, 165 F.2d 824, supra, the First Circuit held that employees who manufactured and packed a chemical fertilizer used in agriculture were not engaged in agriculture within the meaning of section 13(f) of the Act. This decision was expressly approved by the Supreme Court in *Farmers Reservoir*, supra, 337 U.S. 755, 69 S.Ct. 1274. After announcing the above-quoted test, Chief Justice Vinson said:

> "The farmhand who cares for the farmer's mules or prepares his fertilizer is engaged in agriculture. But the maintenance man in a power plant and the packer in a fertilizer factory are not employed in agriculture, even if their activity is necessary to farmers and replaces work previously done by farmers. The production of power and the manufacture of fertilizer are independent productive functions not agriculture." [14]

While peat is primarily a soil conditioner and not a fertilizer, and while it is harvested and collected rather than manufactured, the rationale of these cases is persuasive, particularly so when considered in conjunction with the stated policy of the Act, the legislative history and the subsequent administrative and congressional treatment.

 Therefore, we hold that the company is not entitled to the benefit of the claimed exemption and must comply with the minimum wage, overtime and record-keeping requirements of the Act. Although the company has assured the trial court and this court that, in the event it is ultimately determined that the agricultural exemption is inapplicable, the company will comply with the Act or cease doing business, it would be unreasonable to direct the court below to retain the case on its docket pending reports as to company compliance. We remand with the direction to the District Court to enter an appropriate injunction order.

Reversed and remanded.

---

13.  337 U.S. at 761, 69 S.Ct. at 1278.

14.  337 U.S. at 761–762, 69 S.Ct. at 1278.