NATIONAL LABOR RELATIONS
BOARD, Petitioner,

and

Amalgamated Meat Cutters and Butcher Workmen of North America, Local 73, Affiliated with the United Food and Commercial Workers Union, AFL–CIO, Intervenor,

v.

C & D FOODS, INC., Respondent.

No. 79–1845.

United States Court of Appeals,
Seventh Circuit.

Argued May 1, 1980.

Decided July 24, 1980.

Catherine Garcia, N.L.R.B., Washington, D. C., for petitioner.

Keith A. Reed, Chicago, Ill., for respondent.

Before SWYGERT, PELL and CUDAHY, Circuit Judges.

PELL, Circuit Judge.

This case involves a petition by the National Labor Relations Board (Board) for the enforcement of its order requiring C & D Foods, Inc. (Company) to bargain with Amalgamated Meat Cutters and Butcher Workmen of North America, Local 73, affiliated with The United Food and Commercial Workers Union, AFL–CIO (Union), the Company in prior administrative proceedings having contended that an inappropriate unit had been certified, and having refused to bargain with the Union. This procedure of testing the validity of the certification is pursuant to cases such as *Boire v. Greyhound Corp.*, 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964).

The Company is engaged in the business of breeding hatching, raising, dressing, and marketing ducks, with its main operation located at or near Franksville, Wisconsin. The Company has approximately 300 employees at Franksville, about 260 of whom are hourly employees. The Company's complex at Franksville includes a dressing plant, a feather shed, a pollution plant maintenance operation, and a maintenance shop. The Company also maintains six so-called grow-out farms, all being within a seven and one-half mile radius of the basic complex. The Company operations begin when baby ducks arrive from the Company's breeding and hatching facilities in Michigan. Approximately 65% of the ducklings are delivered directly to the six grow-out farms. A part-time truck driver delivers the remainder to local contract growers. The ducklings are raised in sheds on the grow-out farms until they are ready for processing. Company employees are engaged in various jobs at these farms including cleaning the shed floors, washing and disinfecting the water troughs, bringing waste-absorbing shavings litter to the sheds and spreading it, vaccinating the ducks against disease, and debeaking them in order to prevent injury to other ducks. When the ducks are ready for processing, the grow-out employees deliver them by tractor-trailer to the Company's dressing plant where some 200 employees in six departments prepare them for retail and institu-

tional sale. The ducks raised by the local contract growers are also processed at the dressing plant, often after being stored for a day or two at one particular grow-out shed known as York. A few employees work in connection with the accumulation of a byproduct, the duck feathers, which are removed during the dressing process. In addition to the maintenance employees at the Franksville main plant, there are three groups of maintenance employees outside the dressing plant: four grow-out maintenance employees, two pollution plant[1] maintenance employees, and three maintenance shop employees.

In two prior union elections, each directed by the Wisconsin Employment Relations Commission, the unit included all plant and grow-out employees, being the some 260 hourly employees. A union was not certified in either of these elections. When the petition for certification was filed by the present Union under the federal act, the Regional Director, following a hearing, determined that the appropriate unit for the conducting of an election was as follows:

> All full-time and regular part-time dressing employees, feather shed employees, maintenance employees and truck drivers employed by C & D Foods, Inc., at their Franksville, Wisconsin facilities; excluding York farm grow-out workers, all agricultural laborers, office clerical employees, guards and supervisors, as defined in the Act.

In the subsequent election of 194 eligible employees, 101 voted for the Union, 77 voted against the Union and 2 votes, a number insufficient to affect the results of the election, were challenged. The Company filed an objection, again asserting the inappropriateness of the bargaining unit, and following the exhaustion of administrative procedures continued to decline to negotiate or bargain with the Union with the result that the case is now before this court as hereinbefore indicated.

The Regional Director (RD), in determining the appropriate unit, excluded the employees of five of the six grow-out farms as being exempt agricultural employees. The RD concluded that the York employees, the sixth grow-out operation, were not exempt as agricultural employees because "a substantial and regular amount of their work is spent on the ducks of contract growers." *Employer Members of Grower-Shipper Vegetable Association*, 230 NLRB No. 1011 (1977); *Olaa Sugar Company, Limited*, 118 NLRB 1442 (1957). The RD nevertheless also excluded the York employees on the basis that they did not share a sufficient community of interests with the dressing plant employees, feather shed employees, maintenance employees or truck drivers to require their inclusion in a unit with those employees. The RD also observed that it appeared "that the interests of the York grow-out workers would be closer to those of the other grow-out workers."

Upon first analysis it might seem that the principal underlying question is to determine the matter of the community of interest between the employees of all six of the grow-out operations on the one hand and the remaining hourly paid employees on the other hand. This would result from the fact that if the RD was correct that there was no such community of interests between the York employees and the processing plant employees, then the manner of the work and interests of the other five grow-out farm employees appearing to be sufficiently identical to that of the York employees (other than that York ducks had been grown by nonemployees) that what was said about the York employees' lack of community of interests would be applicable to the other grow-out employees. Unfortunately, a note of ambiguity is introduced by the RD's determination that the interests of the York workers were closer to those of the other grow-out workers, yet these workers were excluded from the unit primarily because of their being agricultural employees and not necessarily because of

---

1. Although the word plant is used in connection with the pollution plant maintenance employees, these employees apparently run the farm treatment systems, check chlorine levels, and make repairs on the tanks and ponds of the farms.

lack of community of interests with the processing plant employees. Therefore, we will examine both the correctness of the agricultural exemption determination and the subject of community of interests. Indeed, the Board in its reply brief in this court explicitly concedes that the Board's unit determination was in large part compelled by the specific statutory exclusion of agricultural laborers, which brief also stated:

> The Board had but two choices: it could either certify a unit that excluded such laborers or it could dismiss the Union's petition altogether. In light of Section 9(b)'s specific direction that unit determinations be made in a manner that will "assure to employees the fullest freedom in exercising the rights guaranteed by th[e] Act"—an end unlikely to be furthered by denying representational rights to 200 employees—the Board's choice was manifestly reasonable.

### AGRICULTURAL EMPLOYEE EXEMPTION

Section 2(3) of the National Labor Relations Act (Act), 29 U.S.C. § 152(3), excludes from the definition of employee "any individual employed as an agricultural laborer." The Act does not define agricultural laborer, but the Board has consistently referred to the definition of agriculture under Section 3(f) of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201 et seq., 203(f) (1970) (FLSA) and the regulations promulgated by the Secretary of Labor pursuant thereto.[2] *See Green Giant Co.,* 223 NLRB 377 (1976); *Adams Egg Products, Inc.,* 190 NLRB 280 (1971).

■ The parties do not disagree that under case law employees ordinarily thought of as agricultural who perform any regular amount of non-agricultural work are not exempt as agricultural laborers. The Board announced this rule in *Olaa Sugar Co., Ltd.,* 118 NLRB 1442, 1443 (1957), and has consistently adhered to that position. *See, e. g., Rod McLellan Co.,* 172 NLRB 1458, 1459 (1968); *Southern Illinois Sand Co., Inc.,* 137 NLRB 1490, 1499 (1962); *Waldo Rohnert Co.,* 136 NLRB 89, 92 (1962), enforced, 322 F.2d 46 (9th Cir. 1963); *Columbiana Seed Co.,* 119 NLRB 560, 563 (1957).

While there appears to be some slight disagreement between the parties now on the exact boundary line, as it is applied to the Company's employees, between the primary and secondary definitions, and while the Company at the original hearing before the RD, as an alternative contention, stated that all of its employees were agricultural employees, as the matter stands before this court, we do not read the Company's position as being that the certified unit employees were agricultural employees or, indeed, that the York employees were. Instead the principal thrust of the Company's position before this court on the present issue is that the RD, in concluding that the non-York grow-out employees were within the exemption and therefore outside of the coverage of the Act, necessarily assumed that these employees never worked with ducks of contract growers. This conclusion, it is argued, was erroneous because there was no substantial evidence in the record that the employees at the other locations did not work on or with contract growers' ducks.

---

**2.** The FLSA definition of agriculture has been divided into a primary and secondary meaning. *Farmers Reservoir & Irrigation Co. v. McComb,* 337 U.S. 755, 762–63, 69 S.Ct. 1274, 1278, 93 L.Ed. 1672 (1949). The primary definition of "agriculture" includes:

> [F]arming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities (including commodities defined as agricultural commodities in Section 1141j(g) of Title 12 [Section

15(g) of the Agricultural Marketing Act, as amended]), the raising of livestock, bees, fur-bearing animals or poultry. . . .

The secondary definition of "agriculture" includes:

> [A]ny practices (including any forestry or lumbering operations) performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market.

29 U.S.C. § 203(f) (1970).

■ The Company points to testimony that the debeakers, vaccinators, and shavings crew workers travel to all farms including York, where the RD specifically found contract growers' ducks were housed; that the shavings crew workers had been used to perform maintenance work and all maintenance employees were included in the unit; and that a truck driver, apparently not included in the unit, spent a significant amount of his time working at the plant in the live-hang area.

The Board concedes that the assumption was made as to these employees that they were agricultural laborers and that the record fully supports this assumption.[3]

■ We find substantial evidence supporting the Board's position on this issue as follows: The contract-grower ducks are delivered directly to three holding houses on the York farm when the ducks are fully grown and they are briefly stored at that site pending delivery to the dressing plant. This pre-dressing holding provides the only contact between grow-out workers and these ducks. As to the vaccinators, debeakers, and the shavings crew, the Board concedes that each of these groups regularly work at the York farm but points out that the vaccinators and debeakers perform their task on very young ducks and that the contract grower ducks are full grown and a day or two away from slaughter by the time they arrive at Franksville. Also, the shavings crew work is the sole responsibility of the York grow-out workers, and while the record reflects that one member of the shavings crew will on occasion fill in on minor maintenance, no evidence was adduced to establish that he or any other crew member performed maintenance functions at the dressing plant. Finally, with respect to the truck driver, the record reflects a

single incident, an emergency involving a break down of a company truck, in which this individual did in-plant work.

As the Supreme Court observed, the determination of the agricultural status of a particular employee is properly left, in the first instance, to the Board "whose special duty is to apply this broad statutory language to varying fact patterns." *Bayside Enterprises, Inc. v. NLRB*, 429 U.S. 298, 304, 97 S.Ct. 576, 581, 50 L.Ed.2d 494 (1977). This task necessarily requires the " 'making [of] distinctions that often are bound to be so nice as to appear arbitrary in relation to each other,' " *Farmers Reservoir & Irrigation Co. v. McComb, supra*, 337 U.S. at 770, 69 S.Ct. at 1282 (Opinion of Justice Frankfurter); nevertheless, the Board's determination must be accepted by a reviewing court "if it has 'warrant in the record' and a reasonable basis in law," *NLRB v. Hearst Publications*, 322 U.S. 111, 131, 64 S.Ct. 851, 861, 88 L.Ed. 1170 (1944). *Accord, N.L.R.B. v. Design Sciences, Div. of Jacobs Engineering Co.*, 573 F.2d 1103, 1104 (9th Cir. 1978). The Board's holding on this issue, being supported by substantial evidence, we accept as the correct result.

## COMMUNITY OF INTERESTS

The Company, in perhaps its strongest argument against enforcement, in reliance on *BASF Systems Division*, 222 NLRB 712 (1976); *Noranda Aluminum, Inc.*, 186 NLRB 217 (1970); and *Kalamazoo Paper Box Corp.*, 136 NLRB 134 (1962); *see also, Capitol Insulation Co., Inc.*, 233 NLRB 902 (1977); *Caron International Inc.*, 222 NLRB 508 (1976); *Training Corp. of America, Inc.*, 162 NLRB 286 (1966) avers that all 260 hourly employees share a strong community of interests in this company's operation, it

---

3. The Board also, as a preliminary matter, argues that the Company's present contention had not been raised before the Board and that the company had offered no "extraordinary circumstances" to justify its failure to do so. The Board states, therefore, that Section 10(e) of the Act precludes consideration of the argument here, citing *Marshall Field & Co. v. NLRB*, 318 U.S. 253, 255–56, 63 S.Ct. 585, 586, 87 L.Ed. 744 (1943); *N.L.R.B. v. Colonial*

*Haven Nursing Home, Inc.*, 542 F.2d 691, 699 (7th Cir. 1976). Because of the order of briefing, the Board did not have an opportunity to address the present position of the Company until its reply brief. Because the Company has not had the opportunity to respond to this procedural matter, rather than engaging in our own search of the record we will address ourselves to the merits, to which both parties have addressed themselves in their briefs.

being an integrated process from start to finish.

█ We agree with the Company that as the Company's business is conducted from the time of the arrival of the ducklings from Michigan until the processing is complete, there is a highly integrated process and that there is a clear demonstration of community of interests insofar as conditions and terms of employment are concerned. While the Company in its brief here elaborates on the elements of wages, benefits, hours of employment, qualification, training, skills, contact, interchange, and supervision, all elements that were before the RD and Board, we think that the RD in his original Decision and Direction of Election has fairly and adequately summarized the details of the integration and community of interests. We therefore set out this summary in the margin.[4]

█ No purpose is served by our expressing an opinion as to what we think under all of the circumstances of this case the most appropriate unit might be, as the Board is not required to choose the most appropriate unit but only to choose an appropriate unit within the range of several appropriate units in a given factual situation. *State Farm Mutual Automobile Insurance Co. v. N.L.R.B.*, 411 F.2d 356, 358 (7th Cir. 1969), *cert. denied*, 396 U.S. 832, 90 S.Ct. 87, 24 L.Ed.2d 83. Further, this court has long recognized that the Board has vast discretion in deciding the unit appropriate for the purpose of collective bargaining. *N.L.R.B. v. Winnebago Television Corp.*, 440 F.2d 369, 370 (7th Cir. 1971).

## OTHER COMPANY CONTENTIONS

█ The Company also argues, however, that the Board's exclusion of the York employees taken in juxtaposition with the inclusion of three groups of maintenance employees outside the dressing plant constitutes arbitrary and capricious action on the part of the Board. This two phase argument is that on the one hand the York employees spend nearly one-third of their time transporting ducks to the plant which is more time than the maintenance employees from outside the plant spend at the plant; yet the York employees are excluded but all of the maintenance employees are included within the unit. Conversely, if it is assumed arguendo that the Board properly divided the Company's employees into two groups, it should be clear that the outside maintenance employees belong with the employees excluded from the unit. At this point we cannot ignore the fact that the York employees' interests are more closely aligned with those of the grow-out workers at the other five farms than with those of the unit employees which latter

---

4. All the Employer's Franksville personnel involved herein are covered by the same wage and benefit schedule, are subject to the same employee manual, attend the same company picnics and parties, are under the same accounting system, receive the same company bulletins and have the same probationary periods. While grow-out workers and truck drivers transport ducks to the dressing plant, the former use farm tractors off the road, and the latter utilize trucks on the road. While there are cleanup workers in the plant and on the farm, the plant workers have to meet stricter standards because of daily inspections by government agencies. All employees use the same parking lots. The shifts of the plant employees and grow-out workers both vary. There is some temporary interchange of employees. One employee who worked part-time in night cleanup in the plant also has assisted the debeaking and vaccinating crews in the past, but has not done so for some time. Non-plant maintenance employees regularly work in the plant on major repairs about twice a month, and sometimes will switch off between plant and grow-out related work. The Employer has a bidding procedure for the plant, but it is not posted at the farms. The farm employees can, however, bid on plant jobs if they happen to learn about them, but other plant employees have preference regardless of seniority. During the last 6 to 8 months, there were three transfers: a plant employee transferred to the maintenance shop, a part-time debeaking employee transferred to a full-time plant position and a part-time grow-out; worker transferred to night cleanup in the plant. In the spring of 1978, four plant employees who were on layoff were offered jobs as debeakers; only one accepted. The grow-out workers work under the supervision of shed managers who report to the general manager, grow-out; whereas, the plant employees are under the supervision of department foremen who report to the plant manager.

employees being exempt under the Act's coverage must be excluded. In this connection there is substantial evidence to support the Board's determination of lack of interchange between the dressing plant employees and the York employees as well as substantial evidence of their independent supervision and we, therefore, cannot say that the exclusion of the York employees is arbitrary or capricious. On the other hand, the record supports the Board's position by substantial evidence that there is in essence a daily interchange between plant and non-plant maintenance employees with the result that all maintenance employees are regularly supervised by both in-plant and non-plant supervisory personnel. Again, we are unable to say under our limited scope of review that the Board's decision is arbitrary or capricious.

Finally, the Company contends that the RD's unit determination defeats the purposes of the Act which, citing *Kalamazoo Paper Box Corp., supra*, are (1) to foster industrial stability and (2) to insure the right of employees to organize and make a completely free choice in selecting a bargaining agency. 136 NLRB at 137.

The Company asks us to take judicial notice of the serious problems created when union and non-union employees are asked or required to work at the same location and the difficult labor relations administrative problems that would result when unit and non-unit employees would be required to exchange places or substitute for each other as they presently are claimed to do in the employer's integrated operation. The Company also suggests it is obvious that the Board engaged in a type of gerrymandering when it directed an election in precisely the unit sought by the petitioning unit. Presumably, although not saying so, the Company has reference to the previously held elections when all hourly paid employees voted and no union was selected. We decline to indulge in any speculation on this point. There are many known instances where the employees of an identical unit have voted one way on one occasion and another way at a later date. We have no basis for knowing that the union strength at the time of the election under review lay just in the unit which was certified.

As this court has observed, fragmentation of units and impairment of rights of excluded employees are always a necessary possibility when the Board determines the scope of a bargaining unit which encompasses less than all employees, *Kendall College v. N.L.R.B.*, 570 F.2d 216, 219–20 (7th Cir. 1978). We agree with the Board that because of the exemption of agricultural employees, it legally could not certify a union comprising all of the Company's hourly employees, but if it therefore refused to certify a unit found appropriate as it did here when that unit constituted 200 statutory employees, simply because the employer engages in some agricultural operations, it would be discordant with § 9(b) which requires the Board to make its unit determination in the manner that insures statutory employees the fullest freedom in exercising the rights guaranteed by the Act. *N.L.R.B. v. Kostel Corp.*, 440 F.2d 347, 349 (7th Cir. 1971).

Accordingly for the reasons set out herein the Board's order is enforced.