# IN THE COURT OF APPEALS OF IOWA

No. 23-1350
Filed December 18, 2024

**ROBERT M. HOGG and KATHRYN A. HOGG,**
        Plaintiffs-Appellants,

**vs.**

**CITY COUNCIL OF CEDAR RAPIDS,**
        Defendant-Appellee,

**PROTECT THE PRAIRIE PARK CORRIDOR, INC., JEREMIAH KENNY, RONALD LIPPE, MICHAEL NOKE, LOUWANNA MORRIS, JOHN SCHRINER, and KERRY SANDERS,**
        Intervenors-Appellants,

**and**

**CARGILL, INC.,**
        Intervenor.
_____

        Appeal from the Iowa District Court for Linn County, Fae Hoover Grinde, Judge.

        Property owners appeal the district court ruling annulling two writs of certiorari related to the city's actions to amend the future land use map and rezone property to allow industrial use by the company who recently purchased the property from the city.  **AFFIRMED.**


        James C. Larew of Larew Law Office, Iowa City, for appellant intervenor Protect the Prairie Park Corridor, Inc. et al.

        Robert M. Hogg, Cedar Rapids, self-represented appellant.

Shannon L. Sole of Faegre Drinker Biddle & Reath, LLP, Des Moines, Samuel E. Jones of Shuttleworth & Ingersoll, P.C., Cedar Rapids, and Christopher H. Dolan (pro hac vice), Minneapolis, Minnesota, for appellee Cargill, Inc.

Patricia G. Kropf and Elizabeth Jacobi of City of Cedar Rapids City Attorney's Office, Cedar Rapids, for appellee.

Heard by Greer, P.J., Buller, J., and Doyle, S.J.*  Chicchelly, J., takes no part.

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**GREER, Presiding Judge.**

We return to the resolution of a dispute involving neighboring landowners[1] and the land use and zoning bodies of Cedar Rapids (the City). As to efforts to both amend the land use plan and rezone part of the Stewart Property ahead of the sale of the property to Cargill, Inc. (Cargill), the Landowners assert the City's actions at various levels were arbitrary and capricious and, for those and other reasons, the land use amendments passed are invalid. After granting the petitions for writ of certiorari, the district court ultimately annulled the writs[2] and denied the motions to reconsider that followed; the Landowners appealed. And, on the first trip to our court, we remanded the case back to the district court so the parties could have their day in court as was required under Iowa Rule of Civil Procedure 1.1410 ("When full return has been made, the court shall fix a time and place for hearing."). *See generally Hogg v. City of Cedar Rapids*, No. 20-1175, 2021 WL 5475586 (Iowa Ct. App. Nov. 23, 2021). After an in-person hearing,[3] the district court again granted summary judgment in favor of the City. The

---

[1] Robert and Kathryn Hogg own a home in the neighborhood contiguous to what we refer to as "the Stewart Property." The Hoggs petitioned for writs of certiorari, and the district court issued the writs in two separate cases—one involving the change to the future land use map (FLUM) and the other involving the rezoning of the Stewart Property. The two cases were eventually consolidated. Other neighbors, Jeremiah Kenny, Ronald Lippe, Michael Noke, Louwanna Morris, John Schriner, and Kerry Sanders appeared and moved to intervene and consolidate their objections to the city plan along with a non-profit group called Protect the Prairie Park Corridor, Inc., established to protect the area. These parties live in a single-family residential neighborhood known locally as "Rompot." Because all of their concerns align, we collectively refer to these parties as the Landowners.

[2] On December 16, 2019, Hoggs filed a petition for writ of certiorari to set aside the City's approval of the amendment to the FLUM (FLUMA) and it was followed by another filing for a second writ of certiorari on December 20 to set aside the approval of the rezoning ordinance.

[3] Each party was allowed ninety minutes to present their evidence and arguments.

Landowners again appeal. Because our review of a city's land use and zoning decision is limited, we find the Landowners did not make the requisite showing to provide the relief they request. We affirm the district court's ruling annulling the writs of certiorari.

**I. Background Facts.**

The City acquired the 27.44-acre Stewart Property in 1997.[4] In the City, various ordinances and regulations guide a property owner's use. Under its land use planning and zoning framework there are land use typology areas (LUTAs),[5] and initially, the Stewart Property was zoned Urban-Low Intensity (U-LI), along with the Rompot neighborhood. In 2010, the City opened the Prairie Park Fishery near the Rompot neighborhood and soon after added a trail that connected the Sac and Fox Trail to the fishery. Enacted in 2015, the comprehensive land use plan (EnvisionCR) identified several goals that the City summarized as: (1) community planning; (2) sustainable growth; (3) improved modes of transportation; (4) natural networks to improve stormwater management, water quality, wildlife habitat, and outdoor recreation; (5) business recruitment and retention including workforce development; and (6) increased neighborhood safety, including a flood control system. That planning document also designated the Stewart Property as suburban residential large lot (S-RLL) and showed part of the area as a greenway to minimize future flood damage. Also in 2015, after a

---

[4] The Stewart Property is located south of Otis Avenue SE and west of Cole Street SE in Cedar Rapids. Before the Cargill acquisition, the Stewart Property was next to an old rail spur and the Prairie Park Fishery.

[5] LUTAs describe areas according to the intensity and type of use, along with other characteristics.

historic flood in 2008, the City adopted a flood control system (FCS) master plan that addressed the earlier flooding in the Rompot neighborhood. That FCS master plan referenced a policy goal to provide "property owners the information they need to make decisions regarding future plans." The FCS plan specifically made this "disposition policy statement": "The City will maintain ownership of City-owned properties within the 200-year floodplain and dispose of City-owned properties outside of the 200-year floodplain." The City's research determined the Stewart Property was "outside the regulatory floodIplain or floodway."

In 2016, after receiving a Resource Enhancement and Protection (REAP) grant[6] for $96,480 to plant a prairie pollinator habitat, the City designated and developed the Stewart Property as a "prairie pollinator zone." But then in 2018, a council resolution was offered, inviting competitive redevelopment proposals for the Stewart Property. Cargill came forward with interest to acquire part of the Stewart Property. With the submission of Cargill's applications and a commitment by Cargill to convert other acres in the vicinity to native pollinator habitat, the City obtained permission from the Department of Natural Resources (DNR) to take the property out of the prairie pollinator zone.

The part of the Stewart Property involved in amending the FLUM and the rezoning was comprised of 16.70 acres. The site can be best illustrated by this overhead view:

---

[6] The City grant application noted: "This project meets important Federal, State and local goals for pollinator habitat restoration and protection of natural resources. Urgency is striking due to the national and statewide pollinator decline of key species and their habitats. Justification comes from numerous federal, state and local goals and priorities directed at addressing complex problems related to watershed, soil, pollinator and invasive species management."



In the request for proposal, the City noted:

> The property is situated in close proximity to the Rompot residential neighborhood and the Prairie Park Fishery. Submittals for the development and transfer of the [Stewart] Property are expected to demonstrate how the proposal minimizes potential adverse aesthetic impacts on the surrounding area and mitigates any conflict with surrounding property uses.

Cargill responded with a proposal to acquire part of the Stewart Property to construct a rail yard that would be near its corn milling plant on Otis Road SE. In 1967, Cargill started its wet-mill corn processing operation in the City. As part of the justification for Cargill's interest in the Stewart Property, it advocated to the City that the new railyard would "reduce the volume of rail traffic through the downtown

[of the City]" and asserted the company needed its own railyard for railcar-switching operations "to remain regionally competitive." Finally, Cargill described the Stewart Property site as being "adjacent to an existing and active railway that connects the Union Pacific mainline and downtown Cedar Rapids."

The City described the process, starting in the fall of 2019:

> . . . Cargill met with City staff to discuss its anticipated applications, as is customary with most development efforts. By letter dated September 18, 2019, Cargill informed residents of the Rompot neighborhood near the Stewart [P]roperty of its intention to "move forward with securing the necessary permits and approvals for building a rail yard on the Stewart [P]roperty." By that time, Cargill had filed its FLUMA application for the Stewart [P]roperty, as well as the Rezoning application When initially submitted, the applications lacked a signature by Cargill, but [Cargill representatives] Dan Pulis and Eric Ruttum signed both applications in counterpart on October 30, 2019. Additionally, City staff was aware of [specific] City Council Resolutions . . . concerning the development of the Stewart [P]roperty, and those resolutions provided documentation that Cargill filled out and submitted the applications as the developer with the knowledge and consent of the landowner, City of Cedar Rapids.
>    Cargill's FLUMA Application sought to change 16.70 acres of the Stewart [P]roperty from a [LUTA]] of Urban Low Intensity (U-LI) to Urban High Intensiity (U-HI), while the Rezoning Application sought to rezone that same portion of the Stewart [P]roperty from Suburban Residential Large Lot District (S-RLL) to General Industrial District (I-GI). The FLUMA was necessary to obtain the Rezoning, and both were necessary to use the property as a rail yard, because a General Industrial District is not appropriate for a LUTA of Urban Low Intensity but it is appropriate for a LUTA of Urban High Intensity. In evaluating the FLUMA and Rezoning applications, City staff directed Cargill to submit professional studies concerning the effect of the proposed rail yard upon neighboring property values, noise levels, wetlands and air quality in the area.

In the initial submission, the FLUMA application and the rezoning application[7] lacked a signature by Cargill but its representative did sign on October 30, 2019.

---

[7] Although both applications involved the same property and applicant and the City coordinated the processes, each were governed by different ordinances and regulations.

The City resolutions involved with those applications stated Cargill was to be the applicant as the representative of the City. A City resolution accepting the proposal passed in August 2018, authorizing the City manager to negotiate a development agreement with Cargill for further consideration by the council. The resolution stated the proposal met the objectives in the request for proposal, including that it "results in a community benefit," "includes a land use compatible with significant flood events," is "[f]inancially viable" and "mitigates, to the extent possible, compatibility with surrounding land uses."

To inform the public, the City established a project folder on its website where information concerning the project could be viewed. Cargill also contacted the Rompot neighbors, scheduled informational meetings, and mailed courtesy cards explaining the changes to adjacent property owners. Throughout the City proceedings, public comments were received—both at the planning commission stage and at the council meetings.

The City presented to the planning commission and contended that for the FLUMA application, the question to be resolved was whether the proposed intensity of the use met the intent of the comprehensive plan. For the rezoning application, the issue was if the proposed land use met the zoning ordinance. In November 2019, the planning commission staff analyzed various factors and made these findings:

> [1.] The property was suitable for an increase in the intensity of use because Cargill's proposed buffering, mitigation[,] and conservation easement satisfied Zoning Code, industry standards[,] and best practices such that it also satisfied the applicable location and compatibility standards from EnvisionCR, namely "buffering from or mitigation of adverse environmental effects including noise, odors, air and light pollution and heavy traffic."

[2.] The changes proposed by the FLUMA and Rezoning were consistent with the Comprehensive Plan and any plans, studies, or resolution by City Council because the "the economic development benefits [of the proposed project] are consistent with the Comprehensive Plan" in that it would support existing long-term employers, target business in the food industry, and utilize railways. Staff also noted that with the mitigation plans, the proposed use would provide for "continued growth at Cargill's corn processing plant, which sustains benefits to the City economy."

[3.] There was a reasonable basis to treat the subject property differently from the surrounding property based upon the peculiar suitability of the land for the proposed use including the history of the area, the existing mainline railroad and distance between it and the proposed rail yard, and the flood resilient nature of the proposed us.

The planning commission voted four to three to recommend City council approval of the FLUMA application. Later that month, a similar presentation was given to the City council where the goals involving EnvisionCR, the assessment of flood risk, and drainage and stormwater management and mitigation associated with development of the rail yard was detailed. Fifty-four citizens voiced opposition, and seventeen expressed support. All eight City councilpersons voted in favor of the FLUMA application. Then, as to the rezoning application, all eight councilpersons voted to approve the first reading of the ordinance amendment; a second reading was later likewise approved. On December 17, after public comments were heard during the third reading, the council unanimously approved the changes to the ordinance and the development agreement entered between Cargill and the City. All through the proceedings at the City level and then to the district court at the hearing held in April 2022, the Landowners compellingly argued that the City's actions caused a

grave injustice for a working family neighborhood where residents and homeowners relied in good faith on the City's plans for our neighborhood and sought relief in our courts. When we bought and invested in our properties, we reasonably expected the City would

adhere to its land use and flood prevention plans for our neighborhood, not destroy the Prairie Pollinator Zone (wildlife refuge) in favor of an industrial rail yard and a berm that sticks like a pier into the middle of the floodplain that was inundated in our neighborhood in 2008.

## II. The Legal Proceedings.

After attempts to change the course of the actions of the City, in December, the Hoggs petitioned for a writ of certiorari to set aside the approval of the FLUMA that allowed the Cargill project to proceed. Then a few days later, the Hoggs filed another petition for writ of certiorari challenging the ordinance to rezone the Stewart Property. The cases were consolidated. Once the writs were issued and the return documents were filed, Cargill intervened in these proceedings. Also intervening in the actions were the Prairie Park Corridor, Inc., and six landowners from the area. The Landowners requested an oral hearing to address each writ. All parties filed briefs in the district court and submitted a voluminous number of exhibits. After the district court reviewed the filings, it annulled the writs and dismissed both certiorari petitions without a hearing.

The Landowners appealed, and we remanded the matter to the district court with directions to conduct a hearing, as is required by the Iowa Rules of Civil Procedure. After a hearing with testimony of the various concerned neighbors, the district court again annulled the writs and dismissed the petitions. After post-hearing motions were denied, the Landowners appeal from the district court's decision.

## III. Standard of Review.

Certiorari is a procedure to test whether a lower board, tribunal, or court "exceeded proper jurisdiction or otherwise acted illegally." Iowa R. Civ. P. 1.1401;

*accord State Pub. Def. v. Iowa Dist. Ct.*, 886 N.W.2d 595, 598 (Iowa 2016).  Our review is for errors at law.  *State Pub. Def.*, 886 N.W.2d at 598.  In a certiorari action, "[t]he plaintiff bears the burden to prove the illegality."  *Nash Finch Co. v. City Council*, 672 N.W.2d 822, 825 (Iowa 2003) (citation omitted).

"With a certiorari proceeding, the district court finds the facts anew only to determine if there was illegality not appearing in the record made before the board."  *TSB Holdings, L.L.C. v. Bd. of Adjustment*, 913 N.W.2d 1, 10 (Iowa 2018).  While "[f]act-findings or issues that were before the [lower tribunal] for decision are 'reviewed under the substantial evidence standard.'"  *Id.* (citation omitted).  That means "[w]e are bound by the district court's findings if supported by substantial evidence."  *Baker v. Bd. of Adjustment*, 671 N.W.2d 405, 414 (Iowa 2003). "Evidence is substantial when a reasonable mind would accept it as adequate to reach a conclusion."  *Hasselman v. Hasselman,* 596 N.W.2d 541, 545 (Iowa 1999) (citation omitted).

Finally, a zoning ordinance, including any amendments made to it, carries a strong presumption of validity.  *Shriver v. City of Okoboji*, 567 N.W.2d 397, 401 (Iowa 1997).  "[T]he challenger must show the ordinance is unreasonable, arbitrary, capricious or discriminatory, with no reasonable relationship to the promotion of public health, safety, or welfare."  *Id.*  If the reasonableness of a board's action are open to a fair difference of opinion, we may not substitute our decision for that of the board.  *TSB Holdings*, 913 N.W.2d at 14 (citation omitted).

**IV. Discussion.**

In this appeal, the Landowners maintain there are issues of first impression and of broad public importance—the Hoggs present various issues, and the

landowner intervenors raise one additional issue. First, the Hoggs frame the issues as: (1) "whether the district court erred by failing to apply the express terms of the City's flood control system master plan that prohibit the sale of City-owned property in the 200-year floodplain, especially where that plan is required by federal and state law"; (2) whether the district court erred by failing to apply the requirements for a City-initiated land use amendment and by ignoring the City's omission of the City manager's role in applying for the land use amendments; and (3) whether the district court erred by upholding the land use amendments without identifying any "change of conditions" as required by *Shriver v. City of Okoboji*. The landowner intervenors join in the Hoggs' arguments but also assert that Cargill's argument of economic hardship caused by its contractual dispute with the railroad and its threat to pull out of the area should not allow the City to put the economic interests of Cargill over those of the citizens who live in the Rompot neighborhood or those who use the recreational area.

We address each of the four arguments raised.

## A. Impact of the Flood Control System Master Plan.

The Landowners point to the City's FCS master plan and assert the district court failed to consider its impact on the decisions made here—just as the City failed to consider the impact of not following the plan on their neighborhood. They contend that in the years before this change in use, the City went to efforts to obtain a REAP grant and plant the Prairie Pollinator Zone, all of which supported its land use plans and its understanding of the FCS master plan. By veering off of those plan requirements, the Landowners suggest the City's actions were "unreasonable, arbitrary, capricious, an abuse of discretion, and the product of

illogical reasoning." *See Webb v. Giltner*, 468 N.W.2d 838, 840 (Iowa Ct. App. 1991) (concluding the municipality may not ignore its own plans when making land use decisions).

To start, the Landowners quote from the FCS plan acquisition/disposition policy regarding "Upstream and Downstream of Physical FCS Improvements," which states, "The City will maintain ownership of City-owned properties within the 200-Year floodplain and dispose of City-owned properties outside of the 200-year floodplain." From this language, they argue that the FCS plan specifically prohibits the City from selling property within the floodplain and, as it pertains here, the Stewart Property. As they urge, this restriction is important to avoid costs of future flood damage, and they point out that the City benefited from federally-funded flood control projects that also include ownership of land for recreational public purposes. In addition to following the FCS plan, the Landowners maintain that the City must also comply with state statutes that require applicants to address watershed management in the property downstream. *See* Iowa Code § 418.9 (2019) (addressing requirements for projects utilizing the flood mitigation fund). On top of that, the Landowners focus on EnvisionCR, which emphasized taking care of the Rompot neighborhood by considering the advantages of a riverfront greenway such as environmental, quality of life, and flood reduction benefits, including floodproofing, elevating structures, and acquisition. The Landowners argue the City violated its commitment to EnvisionCR and to the State of Iowa when it sought and obtained REAP grant funds from the DNR in 2017 through it parks department to plant a prairie pollinator zone as a part of the Sac and Fox Trail. In fact when applying for the REAP funds the City stated:

In 2015 the Envision CR Comprehensive Planning process drew public comments from all areas of the Cedar Rapids community. Officially there were 1,134 participants and hundreds of additional feedback comments used in consideration of plan elements. As mentioned earlier, the environmental sustainability section of this plan, called "GreenCR" strongly advocates for conversion and development of prairie and native vegetation.

And, as it relates to this litigation, the Landowners complain that the district court failed to tell the parties if the City violated the [FCS] plan or if there is a valid reason the City could violate the [FCS] plan by selling the Stewart Property in the 200-year floodplain. With these described violations by the City, the Landowners argued that the action in violating the FCS master plan is an illegal, arbitrary, and capricious action.

On these points, the City argues there is no action that violated the FCS plan, which it characterize as a planning document. The FCS plan noted that its purpose was to "provide direction for the implementation of the [FCS] design and construction" and that it "provides flexibility, with the expectations of review and revisions over the course of time;" to be used by "the City Council, appointed boards, staff, and the general public . . . as a reference for the range of issues and decisions that define the [FCS]." Next, it contends that the acquisition/disposition policy language in the FCS plan relates to property acquired *after* the plan was put in place. Here, the City owned the Stewart Property since 1997, and thus that policy language would not apply to this land. As the City logically argued, the language was "intended to assure that once the [FCS] was established, the properties the City acquired within the 200-year floodplain—either because they were necessary for the new [FCS] or because they would be impacted by floodwaters resulting from it—would not later be redeveloped and thereby risk

repetitive loss." (Emphasis omitted.) And because the language only reflected a policy, the City is free to address those general statements on a case-by-case basis and with the flexibility necessary to avoid negating other objectives of the overall plan. *See Ackman v. Black Hawk Cnty. Bd. of Adjustment,* 596 N.W.2d 96, 103 (Iowa 1999) (recognizing that an argument policies must be strictly applied "would undermine their very purpose—to guide zoning officials in harmonizing competing land uses"). Likewise, other language from the FCS plan bolsters the flexibility advocated here. Flexibility makes sense because, if read as the Landowners suggest, the City would be mandated to sell all City property not in the 200-year floodplain. And in any event, while some parts of the Stewart Property are in the floodplain, some of it is outside the 200-year floodplain— making the "within" requirement only partially applicable here.

Similarly, the City disputes that its actions involving the REAP grant are arbitrary or capricious. First, the City asserts that the REAP grant restrictions were not irreversible; it emphasizes it obtained permission from the DNR to take the property out of the pollinator habitat and secured a commitment from Cargill to convert other acres of land nearby to the same status. These Landowner arguments go directly to the City's ability to amend zoning decisions. *See Hermann v. City of Des Moines,* 97 N.W.2d 893, 895 (Iowa 1959) ("Zoning ordinances may be amended at any time conditions warrant, and the action of the zoning authorities will not be interfered with if the question is fairly debatable."). Contrary to the Landowners' position, we do not find that the REAP requirements were violated.

In sum, to answer the Landowners' questions, the City did not have to strictly follow the planning guidelines of the FCS plan language that addressed properties acquired for the FCS master plan purposes and has flexibility to address flooding and environmental concerns related to the Stewart Property. While the reasonableness of these decisions might be open to a fair difference of opinion, we cannot substitute our views for those of City and its planning arm. *See Helmke v. Bd. of Adjustment*, 418 N.W.2d 346, 347 (Iowa 1988) ("If the district court's findings of fact leave the reasonableness of the board's action open to a fair difference of opinion, the court may not substitute its decision for that of the board." (emphasis omitted) (citation omitted))*.*

**B. Compliance with City Procedures for Land Use Changes.**

The Landowners focus on the process here. They claim the City misled the council, planning commission, and the public. Drilling down even more, the Landowners urge that the City never disclosed to anyone at the public hearings that the City was, in fact, the applicant and that the FCS plan provisions were required to be considered prior to approval of the changes to the land's use.[8] According to City policy, the application for the land use change required the property owner or the City to request the change. The City's zoning code provides: "Changes to the Future Land Use Map may be requested by property owners as part of the land development process, as well as initiated by the City as part of

---

[8] The Landowners assert that the City did not inform the council or the public about the FCS master plan until Hogg sent an email to City staff about its application on December 11, 2019, shortly before final approval of these changes.

necessary community planning and policy development activities." Cedar Rapids Municipal Code § 32.05.03A(1).

Initially, the application was signed by the City manager on September 20, 2019, thus, as the Landowners argue, the City was the applicant. And, if the City was the applicant, the Landowners contend the process required different steps than what happened here—such as the necessary community planning and policy development activities. For example, the required neighborhood meeting was hosted by Cargill, not the City, as should have been required if the City were the applicant. Because of the City's failure to follow the process, the Landowners characterize the City's actions as arbitrary and capricious. The district court called the issue a "deficiency in signing" and concluded that the City did not mislead its staff or the public that Cargill was initiating the requested change as shown in the resolutions passed by the council.

For its position, the City maintains that it signed to show that it, as the *property owner*, "has been informed of and is agreeable to the application being made." Pursuant to its ordinance, the property owner or a duly authorized representative can initiate the FLUMA or rezoning process. Thus, the City argues that Cargill became a duly authorized representative under the application, which was confirmed when Cargill's representative signed the application on October 30, 2019. On the face of both applications, Cargill was referenced as the applicant. Thus, it was clear before there was any final action by the City that Cargill was the applicant. And we agree with Cargill that as to this duty to sign the application, the ordinance is directory, not mandatory. "If the duty is not essential to accomplishing the principal purpose of the statute but is designed to assure order and promptness

in the proceeding, the statute ordinarily is directory and a violation will not invalidate subsequent proceedings unless prejudice is shown." *Taylor v. Dep't of Transp.*, 260 N.W.2d 521, 523 (Iowa 1977). On the question of prejudice, we find the Landowners did not provide evidence that having the City initially sign the application prejudiced them in any way.

As for the issue over notice to the public and council about the language of the FCS plan, it was raised before final decision by the City council, and the City staff opined that the FCS planning document was not binding on the action to be taken by the City. But the Landowners argue that the City staff represented that the issues over the neighborhood flood protection was outside of Cargill's control, when it should have known that the City still controlled those plans on this specific area as owner and applicant. At the planning commission meeting, City staff stated that "[o]nsite berms could be part of the City's flood response plan, but separately will not protect the neighborhood. Complete neighborhood protection would extend to streets and private property outside of Cargill's control." But in the full picture of what was considered and understood by the planning commission and the council, Cargill was required to submit professional studies concerning the effect of the proposed rail yard upon neighboring property values, noise levels, wetlands, and air quality. And as the specific question here is if "siting the railyard at the [Stewart Property] mean[s] that the Rompot neighborhood is protected from flooding," the City website[9] provided this answer: "Likely not. Although Cargill is proposing a large berm between the railyard and the neighborhood, it will not be

_____

[9] A print-out of the information on the website was made part of the record in the district court proceedings.

'tied in' at either end, meaning that floodwaters from the Cedar River could still flow around both ends of the berm into the neighborhood." We do not see how this information was misleading.

We disagree with the Landowners that the process was arbitrary and capricious. "A city council acts arbitrarily or capriciously if it acts 'without regard to the law or facts of the case.'" *Marianne Craft Norton Tr. v. City Council*, No. 08-1704, 2009 WL 3337610, at *5 (Iowa Ct. App. Oct. 7, 2009) (quoting *Dawson v. Iowa Bd. of Med. Exam'rs*, 654 N.W.2d 514, 519–20 (Iowa 2002)). We do not find that happened here. The Landowners' arguments on this issue fail.

## C. "Change of Conditions" under *Shriver v. City of Okoboji.*

Because the City adopted the directives of EnvisionCR and the FCS plan in 2015, the Landowners urge that before an amendment to the zoning ordinance can be approved, the City must identify a change of condition that would justify the change in zoning. The Landowners contend the district court failed to identify what "changing conditions" were considered and, thus, should have sustained the writs. To support their position, the Landowners direct us to the considerations found in *Shriver*, 567 N.W.2d at 402–03. In *Shriver*, property owners disputed the city's change of definition of "corner lot" in the zoning ordinances, which they asserted was undertaken simply to benefit one neighbor and not for the "health, safety, morals, or general welfare of the community." *Id.* at 402. The Landowners argue that *Shriver* confirmed:

> Although an amendment to accommodate or favor a certain property owner, or a limited group of owners, *when there has been no change of conditions since the enactment of a zoning ordinance*, is invalid, it is for the city to decide whether a zoning ordinance, *by virtue of*

*changing circumstances*, has come to operate as an arbitrary and unreasonable restraint on property within the city.

*Id.* at 402-03 (cleaned up) (emphasis added). But *Shriver* also teaches that "the balancing of competing interests affected by zoning is precisely the type of decision best left to local governmental bodies." *Id.* at 403. "Zoning decisions are an exercise of police powers the State delegates to municipalities." *TSB Holdings*, 913 N.W.2d at 14.

> A change in conditions sometimes calls for a change in plans. For this reason, "a property owner has no vested right to continuity of zoning of the general area in which the owner resides. Likewise, the owners of property adjacent to a district which is restricted to a particular use have no vested right in the continuation of that use when the public interest dictates otherwise."

*Neuzil v. City of Iowa City*, 451 N.W.2d 159, 164 (Iowa 1990) (citation omitted). To that point, zoning is dynamic and changing, with "any existing restrictions being always subject to reasonable revisions [in light of] changing community conditions and needs as they appear." *Anderson v. City of Cedar Rapids*, 168 N.W.2d 739, 743 (Iowa 1969). "Thus, we will not declare an ordinance invalid simply because it adversely affects a particular property owner." *Shriver*, 567 N.W.2d at 401.

The district court noted it "considered the changing conditions of the area, and found there was a reasonable basis for spot zoning."[10] The Landowners complain they are still unaware of what "changing conditions" the district court considered, even after they asked for an expanded ruling. Because of this failure, the Landowners request that we "strike down" the zoning change. *See Hermann*,

---

[10] "Spot zoning" occurs "when a zoning ordinance creates a small island of property with restrictions on its use different from those imposed on the surrounding property." *Jaffe v. City of Davenport*, 179 N.W.2d 554, 556 (Iowa 1970).

97 N.W.2d at 897 (striking down an ordinance change and holding that "zoning authorities may not single out one 'spot' or tract and remove some or all of the restrictions upon it unless some reason appears for the discrimination and the action bears some relation to the public welfare").

As the City and Cargill note, the Stewart Property is distinguishable from the rest of the area as it is an open lot with no residential buildings and included an existing rail line close to an existing Cargill plant. As the City characterized it in a presentation:

> There is reasonable basis to treat the subject property differently from surrounding land. The factor of primary importance is its peculiar adaptability to the proposed rezoning. Several sites in the vicinity were considered and ruled out for physical constraints such as topography and the Cedar River. The land's proximity to Cargill's plant (approximately 1.75 miles), railroad connection[,] and physical constructability make this a viable site.

As a further consideration, the City and Cargill contend that the rezoning does not involve spot zoning as the property is not "surrounded by land with one particular zoning classification." Instead, Cargill points to other urban high-intensity areas nearby that show the transition from green space to high-intensity and then to low-intensity, and the City referenced the same zoning pattern in two other locations not far from the Stewart Property. It offered this overlay to show the examples to the district court:

## Future Land Use Map



Even if we considered the City's actions to be spot zoning, we still must evaluate if there is a reasonable basis for that decision. *Perkins v. Bd. of Supervisors*, 636 N.W.2d 58, 68 (Iowa 2001) (finding "one specific factor determinative of [the] issue," the factor being "whether there is a reasonable basis for" for the spot zoning). To that end, "we consider the size of the spot zoned, the uses of the surrounding property, the changing conditions of the area, the use to which the subject property has been put, and its suitability [and adaptability] for various uses." *Id.* And in any event, when examining a reasonable basis for spot zoning, "[o]f primary importance is whether the [property has] a peculiar adaptability for the uses allowed by the amendment or is merely carved out of a similar tract equally suited to the restrictions of the amendment." *Id.* Here, that adaptability consideration offers support for the City's decision. This property was uniquely adaptable as a rail yard next to the railroad. As a further reasonable basis

for the decision, the City considered that the "the economic development benefits [of the proposed project] are consistent with [EnvisionCR]" and, as the City argues, supported "existing long-term employers, targeted business in the food industry, and utiliz[ed] railways." Goals of EnvisionCR including "support existing businesses, fostering entrepreneurism, and targeting industry-specific growth."

We do not substitute our judgment for that of the City. We find the reasonableness of the City's decision is fairly debatable. *See Shriver,* 567 N.W.2d at 401 (finding where the record shows a basis for a fair difference of opinion on the reasonableness of an ordinance, hence "room for two opinions," the ordinance is fairly debatable and should be affirmed).

**D. Improper Use of Misinformation over Cargill's Economic Interests.**

The Landowners, specifically through the Intervenors, addressed a separate argument on appeal and assert that

> Cargill has conflated a private contractual business dispute with [the Union Pacific Railroad Corporation] into a public 'crisis' to assist Cargill into forcing the City to consent to Cargill's recently-described, but apparently longstanding, fifteen-year desire to build and operate a large industrial railroad storage and car-switching facility.

They assert that Cargill improperly involved the City in its private contractual business dispute with the railroad by calling it a "crisis" and insinuating it might close its Cedar Rapids facility if it could not construct a rail yard near its present corn milling operation. In a slightly different approach to the argument above, Intervenors assert the City's reasons for the zoning changes were pretext and, in reality, it was only working to benefit Cargill over the other citizens of the City. Here again, we come full center to what is a difference of opinion about the benefit of these changes to the community at large. As the City did demonstrate reasons for

the changes, which some citizens opposed, we cannot substitute what opinions we might have about the public good involved with this change. Although the neighbors do not agree that the changes are beneficial to the public good, they have a remedy at the ballot box. Our primary consideration is the general purpose of the ordinance and not the hardship it may impose in an individual case. *See Neuzil*, 451 N.W.2d at 164. Because a municipality may amend zoning ordinances when circumstances warrant the change, landowners do not have a "vested right" to the continuation of the current zoning. *Id.* And, the Landowners have the burden to show the ordinance is unreasonable, arbitrary, capricious or discriminatory, with no reasonable relationship to the promotion of public health, safety, or welfare." *Shriver*, 567 N.W.2d at 401. As we concluded above, the ordinance is fairly debatable and, thus, we will not interfere with the City's action.

**V. Conclusion.**

In the end, because the reasonableness of the City's decision is fairly debatable, we do not substitute our judgment for that of the City. We affirm the district court's decision annulling the writs.

**AFFIRMED.**